EVERS, J.T.C.
The issues presented in this real property tax matter are voluminous but all stem from the claim of Berkley Arms Apartment Corp., a cooperative corporation, (hereafter taxpayer) that its mid-rise apartment structure was over-assessed in 1982 by the City of Hackensack, (hereafter city). Also raised were issues concerning discrimination in the assessment, taxpayer’s rights of equal protection, the constitutionality of N.J.S.A. 54:2-39[1] (which conditions the prosecution of real property tax appeals on the payment of taxes), and of N.J.S.A. 54:3-27.2 *264 (which generally provides for interest on tax refunds at the rate of 5%), as applied to this taxpayer within the factual context of this matter. The Attorney General intervened solely for the purpose of defending the noted statutes. R. 4:28-4.
Except for the ultimate issue of value the overriding question presented is the method of valuation to be employed in determining the value of a cooperative which in turn gives rise to questions concerning the impact on value, if any, of the city’s rent control ordinance and of N.J.S.A. 2A:18-61.1 et seq. (Anti-Eviction Act). To be further addressed is the treatment to be accorded to the underlying mortgages of the cooperative corporation, (the payment of which, through monthly maintenance charges, is the responsibility of the shareholders), and taxpayer’s deductions from the gross value for (1) a holding (sell-out) period; (2) “excess taxes” as characterized by taxpayer, and (3) costs of conversion.[2]
I THE FACTS
The property is known as Berkley Arms, a mid-rise apartment building consisting of 120 units, situated on approximately 1.56 acres. There are 60 one-bedroom and 60 two-bedroom apartments with each unit being virtually identical to all others in the same bedroom category. The improvements, which were constructed in 1954-1955, consist of an eight story complex with a two story reinforced concrete parking structure containing 126 parking spaces and an in-ground concrete pool. The property was conveyed to its present owner on April 28, 1981 for a total consideration of $2,793,249.91 in the form of an assumption of a first mortgage having a balance of $1,093,-249.91 and a purchase money mortgage in the amount of $1,700,000. Prior to the sale, the property was operated exclusively as a rental/investor-type property. The purpose of the conveyance was to convert ownership from income-producing to *265 cooperative ownership. It is recognized that this conversion did not in any way change the highest and best use ascribed to the property since it remained multi-family residential use. See Center-Whiteman Corp. v. Fort Lee, 4 N.J.Tax 153 (Tax Ct. 1982).
The 1981 assessment (prior to the conversion) was land $312,500, improvements $1,651,000, total $1,963,500. The 1981 tax was $75,005.70 or approximately $120,000 less than the tax for 1982. In making the 1982 assessment the assessor maintained the land component at its previous level and increased the improvement portion by applying 70%[3] to the gross sell-out price as shown on the public offering statement.[4] The 1982 assessment was land $312,500, improvements $4,447,500, total $4,760,000. The 1982 taxes were $195,160. In effect at all times in question were the Hackensack rent control ordinance which, among other things, provided for vacancy decontrol, and the provisions of N.J.S.A. 2A:18-61.1 et seq. which, inter alia, provides that tenants in possession at the time of conversion who decline to become shareholders in a cooperative or purchasers of a condominium unit, may remain in possession for varying periods of time.
Based on the reproduction cost approach the expert witness for taxpayer, after accrued depreciation, found the total property value to be $4,081,600 while city’s expert, making no allowance for depreciation, estimated the value at $11,940,000. Taxpayer’s expert’s market approach, which was based on the aggregate value of the total cost in cash of the cooperative corporation shares and the cash equivalency of the two mortgages less the previously noted deductions, resulted in an opinion of value of $3,536,000. Utilizing a rather simplistic market data approach (which was not too far removed from the *266 technique employed by the assessor) city’s expert arrived at a value of $5,900,000 which value formed the basis for his final opinion.
II THE CONSTITUTIONAL ISSUES
The resolution of the constitutional attack on the rate of interest paid on refunds (N.J.S.A. 54:3-27.2) must await a determination of the value question. If taxpayer is not entitled to a reduction in the assessment it would be purposeless to address that question now. A fundamental principle of judicial construction is that courts must avoid deciding a constitutional issue if, by disposing of other issues in the case, the constitutional question may be rendered moot. See Donadio v. Cunningham, 58 N.J. 309, 277 A.2d 375 (1971). This matter must first be scrutinized in terms of its substantive merits before the issue concerning N.J.S.A. 54:3-27.2 is addressed.
A. Equal Rights
It appears that the assessments of a few other apartment structures which had recently converted to cooperatives were also increased by the assessor based on the combined totals of the gross sell-out price and the face value of any mortgages. Accordingly, in addition to claiming that this method of assessment was arbitrary, capricious and unreasonable, taxpayer claimed that because only a limited number of taxpayers were singled, out for assessment increases its equal protection rights were violated as set forth in Baldwin Construction Co. v. Essex Cty. Bd. of Taxation, 16 N.J. 329, 108 A.2d 598 (1954). The unique Baldwin situation, however, is distinguishable in that it was a common level case and an appeal from an administrative action of a county board. With the adoption of N.J.S.A. 54:51 A-6 (L.1946, c. 161, § 15, amended L.1973, c. 123, § 2; L.1979, c. 114, § 10, L.1983, c. 45, § 1) formerly N.J.S.A. 54:2-40.4, commonly referred to as Chapter 123, relief is available to any taxpayer whose assessment to true value ratio exceeds the upper-common-level limit of Chapter 123.
*267 Without just cause, an assessor is prohibited from arbitrarily singling out property for an assessment increase. However N.J.S.A. 54:4-23 does require the annual review and revision of assessments when deemed necessary. This requirement was recognized in Tri-Terminal Corp. v. Edgewater, 68 N.J. 405, 346 A.2d 396 (1975) in which it was said:
The law calls for the separate assessment of each parcel annually at its tru-s value on the assessing date. In re Appeal of City of East Orange, 103 N.J.Super. 109, 113 [246 A.2d 722] (App.Div.1968). While practicalities obviously preclude most assessors reviewing every assessment line item every year, see Bergen Cty. Bd. of Taxation v. Bor. of Bogota, 104 N.J.Super. 499, 507 [250 A.2d 440] (Law Div.1969), there should nevertheless be alertness to changed valuation factors peculiarly affecting individual properties in years between revaluations and requiring prompt revision of such assessments in fairness to the particular taxpayer or to the taxing district. Cf. Tp. of Willingboro v. Burlington Cty. Bd. Tax., supra, 62 N.J. [203] at 213-214 [300 A2d 129 (1973) ]. It should be obvious that, absent such attention, the carrying over of assessments each year from one general revaluation to the next is not the proper discharge of the assessor’s function, [at 413-414, 346 A.2d 396.]
The assessor reviewed the assessment on plaintiff’s property because it had been converted to a cooperative arrangement. In his judgment, due to the conversion, an increase was warranted. Thus, although taxpayer may dispute the amount of increase, it cannot claim that the act of reassessment was improper notwithstanding that the assessments for other properties were not revised. If taxpayer proves the assessment was discriminatory appropriate relief will be granted.
B. N.J.S.A. 54:2-39 (now N.J.S.A. 54:51A-lb)
Taxpayer asserts that because of the significant and unwarranted increase in the assessment it was required to borrow a substantial sum of money at a relatively high interest rate in order to comply with N.J.S.A. 54:2-39 which essentially provided that all taxes due and payable for the year for which review is sought must have been paid.[5] This requirement, *268 coupled with the fact that it would be entitled to only 5% interest on any refund of excess tax payments pursuant to N.J.S.A. 54:3-27.2, leads taxpayer to conclude that its due process rights have been abridged and that such requirement is confiscatory. The taxpayer however paid the required taxes and was accorded an expeditious hearing on the questions of valuation and discrimination. Accordingly, the validity of the payment requirement is no longer an issue and is clearly moot. Alton v. Alton, 347 U.S. 610, 74 S.Ct. 736, 98 L.Ed. 987 (1954); Alboum v. City of Newark, 22 N.J. 571, 126 A.2d 885 (1956).
Ill VALUATION
A. The Problem
It is obvious that the approaches taken by the experts, although in the mainstream of common appraisal approaches, do not necessarily adhere to the strictures of each approach in their application. Although the controlling standard of fair market value has been stated and restated to be “the price a willing buyer would pay a willing seller,” New Brunswick v. Tax Appeals Div., 39 N.J. 537, 543, 189 A.2d 702 (1963), it is equally certain that the customary approaches to value are by no means exclusive. See Samuel Hird & Sons, Inc. v. Garfield, 87 N.J.Super. 65, 208 A.2d 153 (App.Div.1965); Passaic v. Gera Mills, 55 N.J.Super. 73, 150 A.2d 67 (App.Div.1959), certif. den. 30 N.J. 153, 152 A.2d 171 (1959); Center-Whiteman Corp. v. Fort Lee, supra.
With the exception of Southbridge Park, Inc. v. Fort Lee, 4 N.J.Tax 30 (Tax Ct.1981), which did not involve a trial on the merits,[6] there exists no court precedent or legislative policy *269 concerning the valuation of cooperatives in New Jersey. The court is aware of the New York practice in valuing cooperative apartment buildings by the income approach. Milton Harbor Co. v. City of Rye, 47 App.Div.2d 632, 363 N.Y.S.2d 647 (App.Div.1975); 880 Fifth Avenue v. Tax Commission, 20 App.Div.2d 879, 248 N.Y.SM 614, aff’d, 17 N.Y.2d 794, 271 N.Y.S.2d 249, 218 N.E.2d 298 (1966). This method of valuation of cooperatives was recently reinforced by the New York State Legislature through its adoption of L.1981, c. 1057, which amended § 581 of the real property tax law and which provides that residential cooperative and condominium buildings shall be assessed at a sum not exceeding the assessment which would be placed upon such parcel were the parcel not owned or leased by a cooperative corporation or on a condominium basis. Under the new statute therefore, condominiums and cooperative apartment buildings are to be assessed as if they were conventional apartment houses, the occupants of which are paying rents.[7] Before the adoption of this statute it had been the law in New York that the preferred method of valuing such income producing properties was the income approach. People ex rel. Parklin Operating Corp. v. Miller, 287 N.Y. 126, 38 N.E.2d 465 (1941); People ex rel. Gale v. Tax Commission, 17 App.Div.2d 225, 233 N.Y.S.2d 501 (App.Div.1962).
Although (as perhaps may still be the case in New York notwithstanding the recent amendment to its real property tax law) it cannot be said that New Jersey requires that all income producing properties be valued by the capitalization of income approach, nevertheless, overwhelming reliance has been placed on that method in such cases. Helmsley v. Fort Lee, 78 N.J. 200, 394 A.2d 65 (1978), app. dism. 440 U.S. 978, 99 S.Ct. 1782, 60 L.Ed.2d 237 (1979); Parkview Village Assocs. v. Collingswood, 62 N.J 21, 297 A.2d 842 (1972); Fort Lee v. Hudson *270 Terrace Apts., 175 N.J.Super. 221, 417 A.2d 1124 (App.Div. 1980), certif. den. 85 N.J. 459, 427 A.2d 559 (1980); CenterWhiteman Corp. v. Fort Lee, supra; Rudd v. Cranford, 4 N.J.Tax 236 (Tax Ct.1982); Jefferson House Investment Co. v. Chatham, 4 N.J.Tax 669 (Tax Ct.1982). It has been held that the effect of rent control is reflected through the income approach. See Parsippany Hills Assocs. v. Parsippany-Troy Hills, 1 N.J.Tax 120 (Tax Ct.1980).
Conversely the court is also aware of suggestions that the income approach is not applicable in the valuation of cooperatives. See Southbridge Park, Inc. v. Fort Lee, supra, 4 N.J.Tax at 35-36 which relied on River House Bronxville, Inc. v. Hoffman, 101 Misc.2d 422, 421 N.Y.S.2d 161 (Sup.Ct.1979). The suggestion there is that when an apartment structure is not rented an income approach (based on potential net income) would be purely speculative.[8]
But for the previously noted treatment accorded to cooperatives in New York, neither the court nor the parties has found any case or statutory law in any other jurisdiction which is helpful in resolving the question. However, even if such aids were to exist their guidance may be more illusory than real in view of the many factors which enter into a determination of an appropriate approach.
Admittedly, in the majority of cases involving valuation of condominiums and cooperatives, the sales comparison approach is used. American Institute of Real Estate Appraisers, The Appraisal of Real Estate (8 ed. 1983) 538, 541. However it cannot be said that, in a given case, the cost and/or income approach is not applicable. The decision as to which valuation approach should predominate depends upon the facts of the particular matter and the reaction to these facts by the experts. New Brunswick v. Tax Appeals Div., supra; Pennwalt Corp. *271 v. Holmdel Tp., 4 N.J.Tax 51, 61 (Tax Ct.1982). Clearly, in this matter a thorough analysis of all the facts and the experts’ reactions and treatment of them is required.
B. Cost and Income Approaches
Both experts employed a cost approach. City’s witness utilized the income approach only to support his estimate of economic obsolescence. The use of the cost approach may be quite helpful in valuing specialty properties which do not bear the attributes of traditional properties so as to render them unsuitable for a market approach valuation. Dworman v. Tinton Falls, 1 N.J.Tax 445 (Tax Ct.1980), aff’d 180 N.J.Super. 366, 434 A.2d 1134 (App.Div.1981), certif. den. 88 N.J. 495, 443 A.2d 709 (1981). While the subject property may not be a “specialty” so as to require the use of a cost approach it may be considered sufficiently sui generis so as to require the court to give serious consideration to a properly conducted cost approach. While the use of such approach in valuing cooperatives cannot be ruled out, it has no usefulness here because it was improperly conducted by both witnesses. Likewise because the income approach was utilized only as a check against the improperly conducted cost approach the court will give it no weight.
In attempting to estimate the land value city’s expert referred to five sales, two of which were assemblages which were deemed nonuseable by the assessor and the Director of the Division of Taxation. Even more difficult to accept was his use of a square-foot analysis rather than a unit cost. The evidence clearly and convincingly disclosed that investors in these types of properties are not interested in the square footage of a given parcel for it is the number of units that produces rental or sales income depending on how the property is utilized. Generally speaking, the size of a lot bears no necessary relationship to the number of units that can be placed on a property which is controlled by the applicable zoning, bulk and height requirements. See Sage v. Bernards Tp., 5 N.J.Tax 52 (Tax Ct.1982), aff’d 6 N.J.Tax 349 (Tax Ct.1984), certif. *272 denied 97 N.J. 581, 483 A.2d 125. Common sense and logic dictate the rejection of a square-foot basis and the adoption of a unit basis.
Furthermore, city’s witness added a profit of 25% ($2,257,720) to his reproduction cost, although the testimony clearly indicated that the construction cost manuals already include soft costs which include builders’ profit. Obviously, the cost approach is to determine the value of the bricks and mortar of the building depreciated (taking into account that a builder will incorporate a profit into that cost of bricks and mortar). The addition of a premium of 25% on the value of this property, in the context of this matter, is without support.
To be distinguished is the situation which existed in the case of a super-regional shopping mall which was the subject of Judge Conley’s opinion in Lawrence Assocs. v. Lawrence Tp., 5 N.J.Tax 481 (Tax Ct.1983) in which he found that the market value of the mall reflected a factor for entrepreneurial profit.
I am persuaded that entrepreneurial profit is a legitimate element of market value that must be measured in this proceeding. The Appraisal of Real Estate states that “developer’s profit in a typical development also becomes part of cost new” in the reproduction cost approach. Id. at 264. Defendant’s first expert was most convincing that a realistic cost approach must recognize “adequate compensation to the entrepreneur to induce him to organize the entire project.” See Kahn, “The Entrepreneur — The Missing Factor,” The Appraisal Journal (Oct.1963), at 472. See also, Fort Lee v. Invesco Holding Corp., 3 N.J.Tax 332, 343 (Tax Ct.1981). As defendant argues, no prudent developer would produce a property such as the Quaker Bridge Mall and sell it for his actual cost of land acquisition and construction. The developer’s raison d’etre is entrepreneurial profit, [at 535]
Not to be overlooked in that situation however was the fact that the appeal was from assessments, including an added assessment, levied during the early years of operation and that the mall, which was situated on a 100-acre tract, consisted of four major department stores and approximately 130 specialty shops, restaurants and other retail establishments. Clearly the seller of that complex would not be content with receiving a price based on the cost of the bricks and mortar plus a builder’s profit. Confronted with that situation Judge Conley quite properly concluded that the developers anticipated a profit from *273 their efforts in assembling and marketing that huge complex with its myriad of mixed uses. There, entrepreneurial profit was the motivation for the seller’s efforts. That situation is quite unlike the instant situation where a single structure, used for a quarter of a century for residential purposes, simply underwent a change in the form of ownership. The extent and the nature of marketing Berkley’s shares of stock defies comparison with the work required in the Lawrence Assocs. matter.
Furthermore, the city’s appraiser applied no depreciation factor whatsoever on the basis that “my study of previous Tax Court decisions ... indicated to me ... that a methodology of this type would most appropriately show ... the upper limit of value ... and ... there was ... [no] other consideration ... [to be given] to the marketing of individual units.” Given that the city disavowed any reliance upon the cost approach other than for the academic exercise of complying with an alleged but illusory requirement of the Tax Court, and in view of the faulty analysis employed by its witness, the city’s cost approach is rejected in its entirety.
Although taxpayer’s expert’s land value estimate may be supportable, his estimate of the value of the improvement can be attributed little weight as his analysis was beset with errors. His calculations were based on a 72-foot high building of non-fireproof construction which was 28-years old. The proofs clearly established that the structure was of fireproof construction, was 78 feet in height and was 26-years of age as of the assessment date. I further note that the witness, while relying basically on the Real Property Appraisal Manual For New Jersey Assessors to determine the base costs, utilized Marshall Valuation Service and R.S. Means Building Construction Costs to calculate the depreciation. A comparison of these three sources suggests that the Real Property Appraisal Manual provides low cost estimates while the other services utilize higher depreciation estimates.
It is in the area of depreciation that the greatest fault is found with the appraiser’s improvement cost analysis. He *274 allowed a total depreciation of 40%; apportioned 20-25% for physical depreciation and 15-20% for economic and/or functional obsolescence. According to the witness the lack of modern bathrooms and outside balconies and terraces, the value of which were not included in his cost estimate in the first instance, created functional obsolescence.
As noted earlier, taxpayer’s expert used the income approach solely to support his opinion of economic obsolescence which he found in connection with the cost approach. By subtracting his opinion of value based on rent-controlled income from that based on uncontrolled-rental income he concluded that the difference reflected economic obsolescence resulting from rent control. In his rent-controlled income approach the witness arrived at a net income for capitalization simply by deducting the actual expenses from actual income. There was no proof that they represented economic rents and/or expenses. Park-view Village Assocs. v. Collingswood, supra. Although there was some support for a finding that the figures used in his free (nonrent-controlled) market income approach were economic, both analyses suffered from his use of a rate of capitalization which was developed via the mortgage-equity band-of-investment technique, which was based on unsupported assumptions. He simply assumed a mortgage-equity ratio of 75%-25%, an equity rate of 10% and a term of 25 years, none of which were satisfactorily explained. Furthermore, I note that the same rate of capitalization was applied in both instances which, without warrant, assumes that an investor would be satisfied with the same rate of return in both rent-controlled and free markets. Thus, I find no reasonable objective quantification for the obsolescence allowance made in the expert’s cost approach.
 The weight to be given to an expert’s opinion depends especially on the facts and reasoning which are offered as the foundation of that opinion. Ocean Cty. v. Landolfo, 132 N.J. Super. 523, 528, 334 A.2d 360 (App.Div.1975). In view of the errors, faulty reasoning and unsupported assumptions no *275 weight is attached to either the expert’s cost or income approaches.
C. The Market Approach
To fully understand the respective market approaches and the adjustments made thereto it is necessary to briefly review the nature and characteristics of a cooperative apartment building and to recite the history of this converted structure commencing with the sale in April 1981.
Cooperative is defined as follows:
A form of ownership whereby the owner of stock in a cooperative apartment or housing corporation pays his proportionate share of the interest and real estate taxes paid by the corporation. This proportionate share is based on the proportion of the total stock he owns, and the interest that is deductible can relate to any debt incurred by the corporation to acquire, construct, alter, rehabilitate or maintain the building or land. The cooperative must be bona fide, i.e., the stockholder’s ownership must give him the right to live in an apartment or house on the property owned or leased by the corporation, though he need not actually live there. [The American Institute of Real Estate Appraisers and The Society of Real Estate Appraisers, Real Estate Appraisal Terminology (1975) 51]
A cooperative apartment is:
An apartment owned by a corporation, either for or not for profit, or by a trust, in which each owner purchases stock to the extent of the value of his apartment, title being evidenced by a proprietary lease. [Id. at 51-52]
Unlike N.J.S.A. 46:8B-1 et seq., which, inter alia, provides that each condominium unit shall be individually assessed as a separate line item on the tax rolls[9] there is no such provision with regard to the assessment of cooperative apartments. Thus, our search is for the value of the whole; a search which has far more complications than does the valuation of an *276 individual condominium unit which invariably entails the use of the market approach (comparable sales) to value and which is often treated as a small claims matter pursuant to a Tax Court rule. 72.8:11.[10]
Notwithstanding that shares of stock are personal property there was no testimony, nor even a suggestion by either party, that a stock purchase entitled the purchaser to anything other than a proprietary lease of a specific apartment unit and the right to occupancy thereof. While the court recognizes that stock ownership includes ownership of a share of all corporate assets including personalty, if any, there was no testimony that the cooperative corporation assets consisted of anything other than the real property which is the subject of this controversy.[11]
On April 28, 1981 Berkley Associates transferred the apartment structure to Berkley Arms Apartment Corporation in exchange for all of the stock of the latter. As previously noted the transfer was subject to a first mortgage and the seller took back a mortgage. The total balance of the two mortgages was $2,793,249.91. There was no claim that the transaction was a bona fide sale between two unrelated parties. While the mortgage indebtedness was utilized in determining a portion of the value per share both parties recognized that it did not represent the total value and added a cash value thereto.
The proposed cash selling prices per share, as contained in the prospectus, were $40 for outside purchases and $34 for ■ *277 inside purchases [12] which prices included the cost of renovations of $8,000 for a two-bedroom unit and $7,000 for a one-bedroom unit. None of the buyers opted to purchase the rights to a renovated apartment. As of October 1, 1981 a total of 39,035 shares (39% of the total offering of 100,000 shares) had been sold for a cash consideration of $1,029,700 or $26.38 a share.
Between April 28, 1981 and June 19, 1981 47 units were sold. Forty of these sales were at inside prices; 15 units were purchased by tenants in possession, 25 units were purchased by outsiders at inside prices, and 7 units, all of which were vacant at the time of sale, were purchased by outsiders at outside prices. The purchases of two of these seven units were conditioned on the purchasers being permitted to buy two additional units at inside prices.
As of the assessment date 38 tenants, pursuant to N.J.S.A. 2A:18-61.11, requested that they be furnished with comparable housing. Some tenants also qualified as senior-citizen or disabled tenants, pursuant to N.J.S.A. 2A:18-61.24, by virtue of which their tenancies conceivably could be protected for up to 40 years. Although the specific number of duplicate requests was not established, the testimony indicates that some, if not all, of the senior citizen/disabled tenants were included in the 38 comparable housing demands. In any event, taxpayer’s expert made no distinction and, for purposes of calculating a deduction for holdover tenants, relied on the protection period allotted to non-senior/disabled tenants.
Between the October 1, 1981 assessment date and November 30, 1982 an additional 19 units were sold, (a 20th unit was a trade for the superintendent’s apartment), with 14 of them having been sold at approximately the outside price. That outside price, according to taxpayer, resulted from the fact that the units were vacant, the vacancies resulting from the pay *278 ment of tenants’ moving expenses and rehabilitation costs by taxpayer.
Taxpayer’s expert arrived at a value of $3,536,000 based on a market approach in the following manner. Based on the actual cash prices of the 47 preassessment-date sales he determined the rounded value to be $26.50 a share (which sum includes the deduction for renovation allowances). Based on the total offering of 100,000 shares he, thus, arrived at a subtotal of $2,650,-000. Reasoning that prevailing first mortgage rates at the time were 14.5%, he determined that the cash equivalent of the $1,093,249.91 balance of the assumed first mortgage, including the reversionary interest (balloon), was $703,089. Based on the testimony of a principal of the corporation that the $1,700,000 second mortgage could not be sold for more than 60%-65% of its face value, the expert applied a 70% factor (30% discount) thereto and determined its present worth to be $1,190,000 for a total unadjusted (rounded) opinion of value of $4,543,000.
Estimating that 50 units (46% of the 100,000 shares) would not be sold for four years because of the protective tenancy provisions of N.J.S.A. 2A:18-61.2g and N.J.S.A. 2A:18-61.11, he deducted the sum of $509,600 from the gross- unadjusted value of $4,543,000. This sum was arrived at through a comparison of the present worth of a share price (46,000 X $26.50 = $1,219,000) deferred four years at 14.5% with the amount obtained by extension of the numbers without discount ($709,-357).
Taxpayer claimed that the increased taxes resulting from the conversion could not be charged to existing tenants (as distinguished from shareholders in the cooperative corporation) and that such taxes represented an additional expense associated with holding -the unsold units for sale and adversely affected taxpayer’s market efforts. Admitting that this impact was difficult to quantify he nevertheless estimated 5% of the total cash selling price or $132,500 ($100,000 at $26.50 x 5%) to be a reasonable deduction. .
*279 The last deduction of $364,900 represented his estimate of costs to effect the conversion. His final market approach estimate of value was $3,536,000. Following the application of an unweighted, unclassified ratio of 65% thereto, he concluded the proper assessment to be $2,298,400.
The city’s comparatively simplistic market data approach was based on the total gross sellout price of $6,800,000 as indicated by the prospectus. That total consisted of two components; the cash payment based on outside prices and the face value of the underlying mortgages. From this total, recognizing that the units were sold in unrenovated condition, the sum of $900,-000 was deducted. His opinion of value was $5,900,000.
Taxpayer argues that the actual selling prices of the stock plus the shareholders’ proportionate obligations of the cash equivalent value of the underlying mortgages represent all of the taxable interests in the real property. In short, it claims that the total of these two components represents the market for these units and it is of no consequence that the unit was vacant or tenanted or whether it was offered at an inside or outside price. In support of that position taxpayer points to the fact that, of the initial 47 sales, only 15 units were sold to tenants already in possession. Of the remaining 32 sales 25 units were sold at inside prices to non-tenants with only seven being sold at outside prices, two of which were sold with special inducements. It further argues that several of the 19 post-assessment-date sales were sold at the inside price and that, as of the time of trial, eight vacant units still remained unsold. This conclusion, according to taxpayer, is not affected by the post-assessment-date sales of other units at the outside (or higher) prices which were inflated due to taxpayer’s expenditures for tenants’ moving expenses, legal fees and rehabilitation work.
City argues that the utilization of any price other than the outside price violates the fundamental principle of valuation which requires that the totality of all interests in property be valued. It argues that the seven pre-assessment-date sales of vacant units to outsiders at outside prices, as corroborated by *280 the post-assessment sales, established the share price (value) of an unencumbered unit. By utilizing the lower price, according to the city, the taxpayer attributed no value to a tenant’s interest. Thus, argues the city, the lower prices represent only the major portion of the “bundle of rights” or only that portion representing the leased fee value.
City further claims that, it being undisputed that all 120 units were physically similar, the market value of an unencumbered unit represents the value of all identical units. To value the units at different levels would violate the mandates of uniform treatment and the same standard of value as required by the New Jersey Const. (1947), Art. VIII, § 1, par. 1.
City equates this situation with that of a landlord-taxpayer whose apartments are shackled with long-term improvident leases in which case the court, in determining economic (market) rents must disregard the improvident leases. New Brunswick v. Tax Appeals Div., supra. Therefore it urges that, by applying the same theory here, the full market value as demonstrated by the outside prices for a vacant unit should not be disturbed simply because rental income of tenanted units is lower than the income which would be derived from a sale. The city thus concludes that the economic (market) value of a unit should not be based on the lower sales price just as a landlord is not entitled to rely on less than economic (market) rental income. I agree with city’s overall conclusion but not with all of its supporting arguments.
The starting point in determining value is N.J.S.A. 54:4-23, which mandates that:
All real property shall be assessed to the person owning the same on October 1 in each year. The assessor shall ... determine the full and fair value of each parcel of real property ... at such price as, in his judgment, it would sell for at a fair and bona fide sale by private contract on October 1 next preceding the date on which the assessor shall complete his assessments____ [Emphasis supplied]
In the search for full and fair value it must first be ascertained what property rights are to be included.
*281 That question was addressed in Koester v. Hunterdon Cty. Bd. of Tax., 79 N.J. 381, 399 A.2d 656 (1979) where it was stated:
N.J.S.A. 54:4-23 directs that each parcel of “real property” be assessed for taxation at its full and fair value. It does not embody any statutory definition but the courts have properly given it expansive meaning in the light of the broad legislative objectives. Thus, the parcel referred to has been held to include the land and its “concomitant improvements.” City of Newark v. West Milford Tp., Passaic County, 9 N.J. 295, 304 [88 A.2d 211] (1952). And the aggregate tax is a lien on the entire fee even where there is separate ownership of the land and the improvement. Crewe Corp. v. Feiler, 28 N.J. 316, 320 [146 A.2d 458] (1958); Becker v. Little Ferry, supra, 126 N.J.L. 338 [19 A.2d 657]. [At 392, 399 A.2d 656]
In addressing the subject in Merchandise Mart Assocs. v. Pennsauken Tp., 3 N.J.Tax 275, (Tax Ct.1981) the court stated:
It is axiomatic that for purposes of local real estate taxation in the State of New Jersey, land and improvements are to be assessed at their total full value and not just the interest of either a lessor or a lessee. New Brunswick [39 N.J]. at 544, 189 A.2d 702. See also, Jersey City v. Harborside Warehouse Co., 19 N.J.Misc. 222 [17 A.2d 572] (Bd. of Tax.App.1941), 17 A.2d 572 and Secaucus v. Damsil, 120 N.J.Super. 470, 474, 295 A.2d 8 (App.Div.1972). [at 282]
The issue also arose in Lawrence Assocs. v. Lawrence Tp., supra, where the taxpayer contended that there were elements of value in the enterprise (a super-regional shopping center) which were quite apart from the value of its fee simple interest in the real estate and that much of that additional value could not be taxed by the township. The township contended that the additional value attributable to such elements as tenants’ leasehold improvements was properly subject to the local property tax. The experts referred to this aspect of the issue in terms of the “bundle of rights” inherent in the complex, meaning that it had freehold and leasehold interests, tenant as well as landlord improvements, and operating covenants and other intangible rights affecting the taxpayer, the department stores and all other shops in the center — all of which proved to be an integral part of the center’s success. Noting that the definitions of real estate and real property are not necessarily synonomous, the former referring to the physical land and appurtenances and the latter to the interests, benefits and rights inherent in the ownership of the physical real estate (the “bundle of rights”); *282 and noting further that the New Jersey Legislature has consistently used “real property” as opposed to “real estate” in local property tax statutes, the court determined that “full and fair value,” as stated in N.J.S.A. 54:4-23, included all interests in the property.
This conclusion is simply an expression of the clear meaning of N.J.S.A. 54:4-23 which requires an assessor to determine the full value of real property and is consistent with the definition of real property as contained in The Appraisal of Real Estate, supra,[13] which states:
Real property includes the interests, benefits, and rights inherent in the ownership of physical real estate. Real property includes the “bundle or rights” that is inherent in the ownership of real estate.
In the bundle of rights theory, ownership of real property is compared to a bundle of sticks. Each stick represents a distinct and separate right, which may be the right to use real estate, to sell it, to lease it, to enter it, to give it away, or to choose to exercise more than one or none of these rights, [at 8]
A conclusion that the outside sales price should be utilized in determining the value of all interests in real property is entirely consistent with the finding in Southbridge Park, Inc. v. Fort Lee, supra, that the sales price of stock representing ownership of individual units and the proprietary leases are the predominant components in the valuation of cooperative structures, just as the outside sales prices of condominium units would be the overriding consideration of value in a building converted to a condominium. See Briskin v. Atlantic City, 6 N.J.Tax 187 (Tax Ct.1983) where the court, in dealing with the valuation of a condominium unit, found that the fair market value of all of the interests was the established price before allowance of a discount to the tenant-purchaser.
Nor does the use of the outside price run afoul of Olin-Mathieson Chemical Corp. v. Paulsboro, 3 N.J.Tax 255 (Tax Ct.1981) in which the use of sales offerings was rejected in the court’s determination of value. In the instant matter there were actual sales at the outside price prior to the assessment *283 date which were corroborated by subsequent sales. Thus it cannot be said that the outside prices were mere offerings; those prices represented the market based on sales.
In my view the fact that taxpayer received the outside price in approximately one-third of the 66 transactions is of no consequence. As noted previously the lesser price simply represents the value of the owner’s interest and does not include the value of the tenant’s possessory interest. That interest is represented by the difference between the outside and inside prices. As to a unit which is subject to a tenancy, regardless of whether it was sold or remains unsold, the total interest could be acquired by paying a sum to the owner and another sum to the tenant. I conclude that total sum, on a share basis, to be $40.
Additionally, the fact that some of the sales were to outsiders at inside prices, notwithstanding that the units were vacant, is of no consequence. The below-market prices could have resulted from taxpayer’s efforts to stimulate immediate sales activity. In fact, the testimony suggests that at the time of conversion the number of sales outweighed the importance of price. A principal of the taxpayer testified, “It was my opinion that unless you sell a substantial number of units the entire conversion is liable to flop. People are liable not to take the risk of becoming buyers in something that may not become a viable conversion. The business decision and the financial decision was that we had to sell 45 units, and that was mostly a financial decision.”
I thus conclude that $40 represents the value (cash portion) of a share of stock. Based on a total offering of 100,000 shares the total value thereof is $4,000,000. To be added thereto is the additional value represented by each shareholder’s proportionate share of the underlying mortgages.
D. The Underlying Mortgages
City, after dividing the total face value of both mortgages, (which it rounded to $2,800,000) by the 100,000 authorized shares, multiplied the resulting $28 a share by the number of *284 shares allocable to the particular unit in order to determine the amount of mortgage obligation allocable to that unit. For example, the 800 shares allocable to an average two-bedroom unit produced a mortgage obligation of $22,400. When added to the cash (outside) price of $32,000 (800 x $40) and deducting the $8,000 renovation allowance, a value of $46,400 for that unit' was produced.
Although such approach has appeal in its simplicity it overlooks the realities of the market place. It gives no consideration to the extent to which the price paid for the stock may be inflated by virtue of any favorable financing. Nor does it allow for the fact that because the corporation, and not the individual shareholder, is responsible for payment of the mortgage to the mortgagee the price may be inflated. The argument that an inflated price is offset by the tax benefits which accrue to shareholders[14] is disposed of by reference to Fort Lee v. Hudson Terrace Apts., supra, where it was said:
The fact that some investors in income producing real estate, such as the apartment buildings here involved, actually consider the income tax benefits to be derived by them personally in deciding whether to purchase such property, or do receive such benefits, has no place or relevance in the proper determination of the true value of the property by any of the conventional approaches to value____ It is obvious that whatever income tax benefits a taxpayer may derive from his ownership of real estate will depend upon facts peculiar to him, such as his income tax bracket for the particular year, the method of depreciation used and the current and unpredictable future provisions of the Federal Income Tax Law. [175 N.J.Super. at 226, 417 A.2d 1124]
See also L. Bamberger & Co. v. Division of Tax Appeals, 1 N.J. 151 (1948).
The Tax Court has ruled on the significance of nonrecourse financing and financing on favorable terms and has concluded that such factors result in a premium being paid for property in excess of fair market value. Niktan Realty Co. v. Passaic, 1 N.J.Tax 393, 399-400 (Tax Ct.1980); Petrizzo v. Edgewater, 2 *285 N.J.Tax 197, 202 (Tax Ct.1981). These opinions are consistent with the rationale of Glenwood Realty Co. v. East Orange, 78 N.J.Super. 67, 71-73 (App.Div.1963) that the use of the actual mortgage on the property to determine its value is an erroneous technique for purposes of determining value for real property taxation.
In employing the market data approach to valuation certain elements of comparison, including financing terms, must be considered with the differences therefor being adjusted when required. In The Appraisal of Real Estate, supra, it is stated:
The transaction price of one property may differ from that of an identical property because financing arrangements vary. If the purchasers of a comparable property had assumed an existing mortgage at a favorable (below current market) interest rate, they may have paid a higher price than purchasers of the subject property can be expected to pay under current market financing terms. The financing arrangements for each comparable property should be considered, and the necessary adjustments should be made to reflect the financing terms under which the subject property is expected to sell, [at 315]
Furthermore, standard definitions of market value posit payment in cash or its equivalent. A current definition of market value is found in The Appraisal of Real Estate, supra, as follows:
The most probable price in cash, terms equivalent to cash, or in other precisely revealed terms, for which the appraised property will sell in a competitive market under all conditions requisite to fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under undue duress, [at 33; emphasis supplied]
The equivalent includes financing terms generally available in the market because the seller still receives cash under such typical terms. In many cases, however, comparable sales carry atypical financing terms that are adjusted to cash equivalents if sufficient supportive information can be obtained. Id. at 304. Here there was sufficient evidence that the first mortgage carried a below-market interest rate. Accordingly, that mortgage amount must be adjusted to reflect its worth as of October 1, 1981, i.e., at the interest rate prevalent in the market at that time.
In support of the use of a 14.5% interest rate, taxpayer produced the testimony of two mortgage officers. Its apprais *286 er, on the basis of that testimony, conversations with four bank representatives and a review of the tables of the American Council of Life Insurance Companies which reflected loans on multi-family properties, adopted an October 1, 1981 rate of 14.5%. While finding that the testimony was vague in some respects and noting that the data reflected by the insurance company tables is subject to considerable differences in interpretation and is not always drawn from transactions involving property comparable to the subject, it is nevertheless clear that first mortgage rates were at least 14.5% and perhaps higher on the assessment date. It is just as clear that such rates were at their peak during that time. The testimony was that prior thereto, in 1979 for instance, the rates were 11-12% and that in early 1983 the rate was 13% and probably declining. In view of that testimony and arguing that stability of assessments requires the application of a lower rate, city in a tacit admission that the 7%% rate was below market, claims that a 12% rate should be used.
As is the case with forecasting weather, forecasting interest rates is very unpredictable. Thus, in view of the need for stability in taxation, our cases uniformly hold that true value of realty must be “fairly constant and must be gauged by conditions, not temporary and extraordinary; but by those which over a period of time will be regarded as measurably stable.” In re Erie R.R. System, 19 N.J. 110, 129, 115 A.2d 89 (1955); Newark v. West Milford Tp., 9 N.J. 295, 307, 88 A.2d 211 (1952); see also Hackensack Water Co. v. Tax Appeals Div., 2 N.J. 157,163 (1949) (value for purposes of taxation has measure of permanency which renders it secure against general temporary inflation or deflation); New Brunswick v. Tax Appeals Div., supra, 39 N.J. at 550, 189 A.2d 702 (The rate of return should reflect conditions for a reasonable span of years); Murnick v. Asbury Park, 2 N.J.Tax 168,188 (Tax Ct.1981), rev’d on other grounds, 187 N.J.Super. 455, 455 A.2d 504 (App.Div.1982) (The assessment process cannot be so acutely sensitive to rates of return available in money markets to require an assessor to adjust his assessment roles to yearly fluctuations). Since both *287 affect the ultimate finding of true value, I find no reason to stabilize interest rates in determining an income approach capitalization rate on the one hand and, on the other, to utilize a specific rate as of a certain date to determine the cash-equivalent value of a favorable mortgage regardless of temporary and extraordinary fluctuations in interest rates.
Taxpayer’s cash-equivalency calculations based on these standards, must be revised to reflect rates over a longer time period. In view of the testimony and in accordance with the aforementioned principles, I find the appropriate rate to be 13% which rate also recognizes the inducement to purchase based on nonrecourse financing. Additionally, based on the unrefuted testimony of a knowledgeable mortgage officer that second mortgage rates are generally 2%-5% higher than first mortgage rates, I find the second mortgage rate to be 16%. The testimony of a principal of the corporation that the second mortgage could not be sold for 60%-65% of its face value was totally without support as was taxpayer’s reliance thereon and his use of a 30% discount rate.
As of October 1, 1981 the first mortgage had a balance of $1,093,249.91 which was required to be paid (with 7%% interest) as follows: $9,116.66 per month through November 30, 1995 (170 months); $7,916.66 from December 30, 1995 through September 1, 2000 (56 months — deferred 170 months); and a balloon payment of $77,000 on October 1, 2000. The 20 year second mortgage was to be repaid in monthly installments of $22,385.60 with interest at 15%. Based on a 13% rate I find that the October 1, 1981 value of the first mortgage was $763,619. Utilizing a 16% interest rate, I find the second mortgage had a value of $1,609,021. The total cash-equivalent value is $2,372,640.[15] Thus the total unadjusted gross value of all shares is $6,372,640.
*288 IV DEDUCTIONS
Turning to the question of deductions, I note initially that no apartments were sold in a renovated condition. Since the $40 a share price included the costs of renovation ($8,000 for two-bedroom and $7,000 for one-bedroom apartments) city allowed for this deduction by decreasing its estimate of the unadjusted gross value by $900,000. Taxpayer accounted for this allowance by utilizing the actual sales prices which were calculated at $26.50 a share. In view of the court’s finding that the market (cash) value of all shares is $4,000,000 a deduction of $900,000 is warranted. Thus the gross value, after deducting for the renovation allowance is $5,472,640.
A. Tenants’ Holdover Period
In support of its argument against a deduction for the time required to market the shares allocable to tenant-occupied (protected) units, city relies on Tall Timbers, Inc. v. Vernon Tp., 5 N.J.Tax 299 (Tax Ct.1983) and ITT Continental Baking Co. v. East Brunswick Tp., 1 N.J.Tax 244 (Tax Ct.1980), both of which rejected the notion of a marketing period. Tall Timbers involved the sale of individual condominium vacant lots which were separately assessed, while in ITT the property consisted of relatively extensive lands and large buildings. I have no quarrel with the reasoning employed in those matters.
In those cases the court was dealing with the value of real property available for sale (not lease) on the assessing dates in a free market. Although such properties may require an extended marketing period, they could nevertheless be sold very rapidly. The marketing time depends solely on the forces present in the market such as social ideals and standards, economic and environmental conditions, supply and demand and the like. The interaction of all these forces constitutes a market and all such forces, over a greater or lesser period of time, generally reach a point of equilibrium. At that point market value and price are equal. There was no proof in ITT of how long it would take to sell the property at full value and under those circumstances there was no alternative but to deny *289 the marketing discount claims. Such is not the case here. Although it has been established that the full value of a share is $40 plus a proportionate share of the value of the underlying mortgages, it is clear that this value will not be realized for a period of time beyond the assessment date. Contrary to the lack of proofs in ITT, I find that the taxpayer has clearly demonstrated that until such tenants’ rights are extinguished the full value of the unit will not be realized.
Here, taxpayer argues not for a deduction for a marketing period because of normal forces found in the market, but rather because of forces over which neither the buyer nor seller has any control. These forces, according to taxpayer, consist of the statutorily-protected status granted to tenants by which they may continue to reside in the converted building, impervious to tax increases while paying controlled, below market rents. Thus, while the shares allocated to such protected apartments could all be sold on the assessment date the price paid would be less than full value because the purchaser would not acquire all benefits of ownership until the protection expires. It is only at that point that either the rental income will at least equal the purchaser’s investment and carrying costs or the buyer will occupy the unit himself. To account for the less than full value which a prudent buyer would pay, the taxpayer allowed a deduction from the gross sell-out price.
Plainly, the enactment of the Horizontal Property Act, N.J.S.A. 46:8A-1 et seq. and the Condominium Act, N.J.S.A. 46:8B-1 et seq., in many instances, negatively impacted on the rights and status of tenants who occupied such buildings prior to conversion. Thus, in 1975, the Legislature enacted c. 311 which, among other things, preserved intact the original tenancy rights of preexisting tenants for a minimum three-year period. N.J.S.A. 2A:18-61.1k, -61.2g. The tenant is entitled to an offer by the landlord-converter of being furnished with comparable alternative housing. N.J.S.A. 2A:18-61.11. The comparable housing requirements specifically provide that, “The court shall authorize one-year stays of eviction with reasonable rent increases until such time as the court is satis *290 fied that the tenant has been offered comparable housing____” A maximum of five such stays is authorized. N.J.S.A. 2:18-61.-11.[16] Rather than have more than one such stay imposed, a landlord-converter may elect to waive the payment of five-months rent by the tenant as a hardship relocation compensation. Ibid.
Comparable housing is defined in N.J.S.A. 2A:18-61.7 as
"Comparable housing or park site” means housing that is (1) decent, safe, sanitary, and in compliance with all local and State housing codes; (2) open to all persons regardless of race, creed, national origin, ancestry, marital status or sex; and (3) provided with facilities equivalent to that provided by the landlord in the dwelling unit or park site in which the tenant then resides in regard to each of the following: (a) apartment size including number of rooms or park site size, (b) rent range, (c) apartment’s major kitchen and bathroom facilities, and (d) special facilities necessary for the handicapped or infirmed; (4) located in an area not less desirable than the area in which the tenant then resides in regard to each of the following: (a) accessibility to the tenant’s place of employment, (b) accessibility of community and commercial facilities, and (c) environmental quality and conditions; and (5) in accordance with additional reasonable criteria which the tenant has requested in writing at the time of making any request under this act.
It is noted that N.J.S.A. 2A:18-61.22 et seq. (The Senior Citizens and Disabled Protection Act), which protects the tenancies of qualified tenants for a period of up to 40 years (N.J.S.A. 2A:18-61.23) further provides that if the protected tenancy arises in a rent-controlled municipality no rent increase beyond that permitted by ordinance will be permitted. N.J.S.A. 2A:18-61.31. Additionally, the statute provides that increased costs resulting from the conversion would not even be permissible in a hardship hearing before the rent stabilization board. It was stated in B.H. Associates v. Brudner, 185 N.J.Super. 403, 407, *291 449 A.2d 23 (Cty.Ct.1982), “This court does not believe that the Legislature intended any less protection during an extended tenancy under N.J.S.A. 2A:18-61.2g or 61.11 than is afforded under the extended tenancy provided by L.1981, c. 226” (N.J,S.A 2A:18-61.23 et seq.). Accordingly, such protection has been afforded to all protected tenancies.
Subsequent to the passage of the Senior Citizens and Disabled Protection Act the New Jersey Department of Community Affairs promulgated a regulation prohibiting any rent increases which reflect increased costs attributable, directly or indirectly, to the conversion which do not add services or amenities not previously provided. N.J.A.C. 5:24-1.12(c), eff. September 10, 1981.[17] It has been held that increased taxes resulting from a conversion are increased costs. In B.H. Associates v. Brudner, supra, the court found that:
... a municipal property tax increase after the conversion is an adverse impact resulting from the conversion. It is not an ordinary tax increase caused by improvement of the physical plant, nor is it an ordinary operating expense, which should rightfully be borne by the tenant. It is an extraordinary expense incurred by the owner, by virtue of an investment decision made by him. It is, in every sense, an ‘increased’ [costs] solely the result of the conversion,____ which [does] not add services or amenities not previously provided. L.1981, c. 226, § 10; N.J.A.C. 5:24-1.12(c).[18] [at 408, 449 A.2d 23]
Thus, it is clear that only rent increases permitted by ordinance may be charged to protected tenants. Just as clear is the fact that tax increases resulting from the conversion, as is the case here, cannot be passed through to such tenants.
Obviously a comparable housing unit in the City of Hackensack must be a unit that is vacant and available for occupancy. *292 The Hackensack rent-levelling ordinance provides for vacancy-decontrol. Thus, if a vacant unit satisfies all other requirements of the comparable housing definition, it is hardly likely that it will satisfy the requirement that the rent be comparable. Accordingly, it defies common sense to find that a protected tenant, whose rents are subject to only minimal annual increases and who cannot be charged for tax increases, will forsake such benefits and choose to relocate to a unit which is not subject to such controls.
An obvious argument against a holding-period deduction is that the property is subject to such regulation, not because the law requires it, but because the taxpayer agreed to it. The thrust of that argument is that the position of the taxpayer does not materially differ from the long term lease situation which proves to be improvident due to prevailing economic conditions. “[T]he valuations of properties for local taxation cannot vary with the managerial successes or failure of the owners. Adjacent properties of equal potential cannot be assessed differently because one proprietor was more or less astute than the other.” New Brunswick v. Tax Appeals Div., supra, 39 N.J. at 544, 189 A.2d 702.
If all tenants in possession as of the conversion date were of the senior citizen and/or disabled variety it may then be more convincingly argued that the hypothetical purchaser voluntarily accepted the situation because in that case a fairly accurate projection may be made of the number of protected tenants. The senior citizen/disabled tenant protected status applies only to those tenants who qualify as of the conversion date. N.J.S.A. 24A-61.22. N.J.S.A. 2A:18-61.28 provides that consideration for such protected status will only be extended to those tenants who applied therefor prior to the date of conversion. A determination of the tenant-applicant’s status must be made within thirty days after receipt of the application. Thus, as of the conversion date, or reasonably soon thereafter (in the instant matter certainly before the assessment date) a prospective purchaser would be in position to know the status of the senior citizen/disabled tenants.
*293 Such is not the case with respect to all other tenants who have no duty to declare their intentions for a three-year period and who, depending on circumstances, may possibly remain as tenants for a period of eight years. Given that situation the hypothetical prudent purchaser, under the best of circumstances, cannot even begin to project what the future may hold. Although common sense tells us good management will produce greater benefits than poor management, managerial talent plays no part in the circumstances present here.
It may also be argued that such government imposed restrictions simply create an encumbrance or cloud on the form of legal ownership and thus do not impact on the value of the total interests as opposed to, for instance, the effects of N.J.S.A. 13:9A-1 et seq. (Wetlands Act) and N.J.S.A. 13:19-1 et seq. (Coastal Area Facilities Review Act), or local zoning ordinances all of which control the use to which property may be devoted and thus impact on its total value. However, I do not view the imposition of these government regulations as having a lesser impact on value than would zoning restrictions. In the latter case, in the proper circumstances, a taxpayer may obtain relief. In the former, except through seeking a reduction in taxes, there is no recourse as the taxpayer cannot pass through (to the protected tenants) tax increases resulting from the conversion; and cannot even rely on these circumstances as support for a hardship rent increase in spite of the fact that the rental income does not offset the owner’s overall costs in purchasing and carrying the converted apartment. Such restrictions are far removed from the problem which may be visited upon the lessor in an improvident, but voluntary, lease situation. Nor do I view this situation any differently than an attempt to value two identical rental apartment structures, one subject to rent control and the other having no such restrictions. Both are and will continue to be used for residential purposes. While theoretically the fact of rent (or nonrent) control does not affect the overall value of all interests it cannot be argued that the artificial caps placed on income in the rent controlled property do not affect price.
*294 The argument that the values of condominiums and cooperatives should be established through the comparable sales method because they are sold on a unit basis as opposed to rental buildings which are purchased by investors whose chief concern is with the amount of return on investment, within the context of this matter, is fallacious.
That argument presumes that all units are either vacant and available for sale as of the assessment date and if not vacant, that the income to be derived from the protected tenant will at least equal the purchase price and carrying costs. That argument overlooks the fact that a purchaser of a unit occupied by a protected tenant does not acquire the entire “bundle of rights” to which he is entitled in that he does not obtain the right of use and occupancy.[19] The purchaser of a tenanted apartment is not an owner-user at the time of purchase but rather is an owner-investor and common sense dictates that he will not invest at a price which will result in a loss. Thus, while a cooperative may be considered to be converted when the filing requirements are satisfied, it cannot 'be said to be totally converted for assessment purposes until all units are sold and occupied by purchasers at which point price may represent value.
In that posture, while a gross sell-out price (based on outside prices) may represent the value of all interests, it may not be, and here it is not, indicative of the price which would be paid for the property as a whole on the assessment date. As the gross sales potential, it simply represents the maximum amount that may be paid if all units were vacant and available for occupancy by the purchaser. In this situation, where the gross sell-out price represents the upper limit of value (a limit generally accorded to the cost approach), I conclude that a deduction *295 from that base amount for the protected tenancy period is required.
This result, not unlike the effects of rent control, will probably cause a (temporary) shift of the tax burden. That shift however is not caused by this, or similarly situated taxpayers, nor does it come about by way of judicial decree; rather it results from legislative fiat in the Legislature’s attempt to accomplish the greatest good for the greatest number.
Obviously the difficulties encountered in marketing converted rental units in rent-controlled communities are not unique to Hackensack or even to New Jersey. Concerning conversions in New York City the court, in Precision Dynamics Corp. v. Tax Commission of the City of New York, 86 App.Div.2d 799, 447 N.Y.S.2d 182 (App.Div.1982) observed:
In deciding this appeal, cognizance must be taken of the fact that cooperative conversion in New York City is often difficult to effect within the strictures of rent control and rent stabilization. The sponsor frequently meets tenant opposition, challenges from the Attorney-General, financing problems and sundry other difficulties. The City has not shown any likelihood that this building could have been converted to cooperative use within the near future through any reasonable efforts of the owner. As was mentioned above, most of the tenants in the building were either rent-controlled or rent-stabilized during the tax span involved. The City has not demonstrated that even one tenant in the building was interested in forsaking his rent-controlled or rent-stabilized status in favor of a cooperative arrangement. [447 N.Y.S.2d at 184]
On or about the time of conversion 38 tenants had demanded comparable housing including protected senior citizen or disabled tenants. No testimony concerning the probabilities of any of the latter remaining for a 40-year period was adduced. The taxpayer, as earlier noted, simply grouped all protected tenants together and estimated that a conservative four-year (average) period would expire before units then occupied by all holdover tenants would become available for sale. Noting that some 54 units remained unsold as of the time of trial taxpayer’s expert estimated that approximately 50 units (46% of the available 100,000 shares) would be subject to protected tenancies.[20] *296 Based on a four-year holdover period he deferred the collection of the sales proceeds (46% of 100,000 shares X $26.50 = $1,219,000), which, at a 14.5% rate of return, resulted in a deferred amount of $709,357 or an adjustment of $509,600.[21]
Based upon the protection afforded by the state and local restrictions a four-year holdover period commencing from the assessment date is found to be very reasonable. However the expert’s estimate that 50 units would be affected is without support in view of the fact that the tenants of only 38 units qualified for protection on the assessment date. Accordingly, the court’s reconstructed analysis will be based on 38 units being under the protective shelter (32% of the 100,000 available shares) a 13% interest rate (as previously determined), a four year protected tenancy period and a share (cash) value of $40. The result is a $494,952[22] adjustment to the previously determined gross value (less renovation allowance) of $5,472,640 leaving, after deduction for the tenants’ holdover period, the sum of $4,977,688.
B. Excess Taxes
The deduction labelled “excess real estate tax adjustment,” according to taxpayer, translated into a negative impact on value as a result of excessive maintenance charges to shareholders. Taxpayer argues that the impact of the high taxes on potential sales was evidenced by the fact that, at the time of trial, eight vacant units could not be sold. Although admitting that because of the instant tax appeal it is difficult to quantify, taxpayer’s expert nevertheless estimated that a reasonable *297 deduction for this impact was $132,500 based on 5% of his estimate of the total selling (cash) price (100,000 shares x $26.50 X 5%).
Taxpayer’s deduction for “excess real estate taxes” is unsupportable; no authority whatsoever has been cited for this proposition; nor is there any basis in fact for such an allowance. The fact that there are eight vacant units which have not been sold can be attributed to any number of factors and not simply to the tax increase. It can fairly well be assumed that the other structures converted to cooperatives in Hackensack (referred to by taxpayer in connection with its earlier argument) were also engaged in marketing their units but no testimony concerning sales or the lack thereof in those structures was adduced. A comparison of the sales history of the subject with those other cooperatives may have been enlightening.
Most importantly, this claim overlooks the very reason for this entire proceeding. The function of this court is to determine the proper assessment level which, in turn, will determine the proper amount of taxes to be paid. Should the court find in favor of the municipality and affirm the original assessment no “excess taxes” will exist. Should a reduction be granted a refund will be paid to the corporation and the shareholders, both present and prospective, will proportionately benefit therefrom. This fact was also recognized by taxpayer’s expert witness who stated, “If my opinion of value is correct and the units were assessed at that [value] there may not be [a need for such deduction].” In either event a deduction for taxes has no place in a proceeding the object of which is to establish the value of the property and the consequent tax liability. Until that result is determined it cannot be said that taxes are excessive. The deduction is disallowed.
C. Conversion Costs
Claiming that the deduction of conversion costs is a recognized appraisal technique as indicated by The Appraisal of Real Estate, supra at 147-148, the taxpayer next deducted *298 the sum of $364,900. These costs included legal and syndication fees, realty transfer tax, mortgage commitment commission, printing costs, interest, mortgage points and other miscellaneous expenses relating to the conversion. While, according to the witness, these costs actually totalled $787,443 he stabilized them at $364,900. Without expressing any opinion concerning the validity or accuracy of the actual or stabilized conversion costs, I find that in the circumstances of this case conversion costs cannot be deducted.
Taxpayer’s allowance for such costs misconceives the underlying reasoning for such deductions and the point in time when such deductions are proper. Clearly, such costs are to be considered by the prospective builder or the converter of a condominium-cooperative structure just as they are an appropriate consideration for a horizontal subdivider where these costs, together with costs relating to the construction of streets, utilities, advertising, sales, inspection fees, financing fees and carrying costs are valid considerations. They represent probable expenses to be deducted from projected gross sell-out prices in order to determine at what price the hypothetical buyer envisioned in N.J.S.A. 54:4-23 would purchase an unsubdivided tract for future subdivision purposes. That method of estimating the value of vacant land for subdivision purposes has been referred to as the subdivision method or the anticipated use method. The Appraisal of Real Estate, supra at 147-148; Fuller, “Appraisal of a Proposed Residential Subdivision Development,” Friedman, Encyclopedia of Real Estate Appraising (3 ed. 1978) 662. Furthermore, because the lots will be sold over a period of time a discount for market absorption is a critical element in determining the price the proposed subdivider will pay in the first instance. This method was fully analyzed in Genola Ventures v. Shrewsbury, 2 N.J.Tax 541 (Tax Ct.1981), in connection with the valuation of vacant land for subdivision. With respect to vertical subdivisions a similar analysis of this method was performed in Center-Whiteman Corp. v. Fort Lee, supra, which involved the valuation of a multi-family structure for conversion to a condominium.
*299 It cannot be overly emphasized that in employing the anticipated use theory the goal is to value a property — not for the use to which it is presently devoted or in its existing form — but for an anticipated use or in an anticipated form. Thus, to arrive at a present value of the future anticipated use or form, a deduction from the upper limit of value (gross sell-out) of the expenditures which will be necessary to achieve that end is required. The result is that price which a knowledgeable purchaser will pay. N.J.S.A. 54:4-23.
There is a vast difference between that situation — where a different form of ownership or use is anticipated — and where that ownership or use presently exists. Here the price for the anticipated subdivision and change of form, which was the goal in Genola Ventures and Center-Whiteman, was already paid in April 1981. That price represented or should have represented, the value to the prospective converter after giving due consideration to the conversion costs. To allow these costs where the conversion has already happened would be tantamount to a double deduction.
This conclusion is not inconsistent with the court’s previous allowance of a deduction for the four-year holding period for protected tenants. As previously discussed, there is a major difference between a market absorption deduction in the anticipated use theory and an allowance for the impact of protected tenancies after conversion. In the former instance an expense representing carrying costs during the marketing period, if warranted by the facts, is deducted. In the latter situation a form of a cash-equivalency analysis is applied to account for the fact that a full return (ownership plus use) on an investment, already made, will not be realized until some future point. The former deduction is peculiarly applicable to the anticipated use technique where the search is for value in a conversion market but where conversion has not happened, while the latter applies to existing condominiums or cooperative structures and then in varying degrees (zero % in newly constructed buildings where there are no protected tenancies to a greater degree to conversions which are affected by government regulations).
*300 The value of this structure on October 1, 1981 is thus found to be $4,977,688 which value was arrived at in the following manner.
Cash portion of shares (100,000 x $40) $4,000,000
Mortgage portion of shares 2,372,640
Upper limit of value . $6,372,640
Less: renovation costs ($900,000 and
protected tenancy deduction $494,952) 1,394,952
Total value $4,977,688
V DISCRIMINATION
Taxpayer alleges discrimination and seeks the application to true value of an unweighted, unclassified ratio of 65%, which it claims was extant in Hackensack during this time period. Alternatively, it seeks relief from discrimination pursuant to Chapter 123. The Chapter 123 ratio was 72% with a common level corridor having an upper limit of 83% and a lower limit of 61%.
In seeking the application of the 65% unweighted, unclassified ratio, taxpayer produced a well qualified expert in the field of statistics whose testimony was virtually uncontroverted. Notwithstanding such testimony and without expressing any opinion with respect to the accuracy of the expert’s conclusions, I find that taxpayer’s claim must fail.
Essentially taxpayer claims that the relief afforded by Chapter 123 is inadequate and thus seeks relief on constitutional grounds. This issue was squarely presented to the court in Rudd v. Cranford Tp., 4 N.J.Tax 236 (Tax Ct.1982) (where the unweighted, unclassified ratios for 1979 and 1980 were 82% and 70% and the Chapter 123 ratios were 92% and 80% respectively) and in 525 Realty Hold. Co. v. Hasbrouck Heights, 3 N.J.Tax 206 (Tax Ct.1981) (where the 1978 unweighted, unclassified ratio was 37.99% and the Chapter 123 ratio was 43%). In both matters the court determined that when the ratio of assessment to true value warrants it, the Chapter 123 ratio will be applied unless it is shown by “... a fair preponderance of the evidence *301 that the application of the Chapter 123 ratio would have a virtually confiscatory effect.” Rudd v. Cranford Tp., supra at 248; 525 Realty Hold. Co. v. Hasbrouck Heights, supra at 216. In both matters it was concluded that to award discrimination relief beyond that provided by Chapter 123 would do violence to the fundamental, cardinal principle of taxation — stability of assessments.
To allow a taxpayer a further reduction by virtue of statistical wizardry would do violence to the critical proposition long ago stated and restated that, “Mathematical perfection in taxation is unobtainable.” In re Appeal of Kents [34 N.J. 21, 166 A.2d 763 (1961)], supra. At this juncture in the litigation we are dealing not with the per se vindication of constitutional rights but of the measure of relief warranted in guaranteeing those constitutional rights, i.e., that a taxpayer shall not pay more than its fair share of the burden of taxation. In short, the taxpayer herein would be granted a preference by virtue of statistical pyrotechnics. [Id. at 215]
These decisions were fortified by Murnick v. Asbury Park, supra, and Weyerhaeuser Co. v. Closter, 190 N.J.Super. 528, 464 A.2d 1156 (App.Div.1983) which stand for the proposition that the Chapter 123 ratio is exclusive and mandatory absent a showing of error in its underlying calculations or that its application results in a discriminatory assessment in the constitutional sense. N.J. Const. (1947), Art. VIII, § I, par. I.[23]
Assuming arguendo that taxpayer’s study and analysis are more sound than that employed by the Director, the fact remains that it has not demonstrated that the Chapter 123 ratio of 72% was erroneously calculated or that its application is virtually confiscatory and thus unconstitutional. However it is clear that the ratio of assessment ($4,760,000) to true value ($4,977,688) of 95.6% exceeds the upper limit of the Chapter 123 corridor (83%) and thus it is entitled to relief. The assessable *302 value is $3,583,935 which is determined by applying the Chapter 123 ratio of 72% to the true value of $4,977,688.
VI INTEREST
The final issue to be addressed is taxpayer’s claim that N.J.S.A. 54:3-27.2 is unconstitutional as it applies to the facts of this matter. That statute provides:
In the event that a taxpayer is successful in an appeal from an assessment on real property, the respective taxing district shall refund any excess taxes paid, together with interest thereon from the date of payment at the rate of 5% per annum, within 60 days of the date of final judgment.
Taxpayer argues that its rights have been violated in light of the alleged gross neglect on the part of the city in assessing the property (an argument previously disposed of and one that has no validity in view of the court’s finding that the true value exceeds the assessment) and the miniscule 5% interest rate bn refunds as compared to the 16% rate paid by taxpayer on funds which it had to borrow in order to pay the taxes. Presumably, taxpayer claims that the combination of the required tax payments and the 5% interest on refunds is confiscatory. It urges that either the requirement to pay taxes (an issue earlier found to be moot) or the 5% rate on refunds be modified to restore the taxpayer to some semblance of status quo ante. This would be accomplished, according to the taxpayer, by requiring the municipality to pay the same rate on refunds to taxpayer as taxpayer had to pay for its money.
These assertions are totally irrelevant to the legal validity of N.J.S.A. 54:3-27.2. Although there is no doubt that the interest rate charged to borrowers, such as this plaintiff, during the 1982 tax year exceeds the prevailing prime rate,[24] the court can *303 equally take judicial notice of the fact that banks and savings and loan institutions were paying far less interest on conventional passbook accounts during the same period. In a constitutional context, however, the issue does not deal with prevailing interest rates but whether a municipality is legally mandated to pay a “going rate” of interest on local property tax refunds. Taxpayer suggests the constitutional standards mandate the Legislature to reflect a floating interest rate applicable to any refund provision under the local property tax law. This suggestion is without any legal foundation.
The Legislature, as a matter of fiscal policy, has determined to permit taxpayers entitled to a local property tax refund to receive interest on refunds at a 5% annual rate. However, there is clearly no constitutional mandate on any governmental entity in this State to provide any interest whatsoever on tax refunds. It is thus a recognized common law rule reaffirmed by the United States Supreme Court that,
Interest, when not stipulated for by contract, or authorized by statute, ... is not to be awarded against a sovereign government, unless its consent to pay interest has been manifested by an act of its Legislature, or by a lawful contract of its executive officers. [United States v. North Carolina, 136 US. 211, 216, 10 S.Ct. 920, 922, 34 L.Ed. 336 (1889)]
In conformity with this common law principle, it is the established law in this State that interest is not recoverable on a refund of taxes unless express provision therefor is made by statute. Frieman v. Randolph Tp., 185 N.J.Super. 152, 162, 447 A.2d 927 (App.Div.1982); Edgewater v. Corn Products Refining Corp., 136 N.J.L. 664, 57 A.2d 39 (E. & A.1947); Hahne Realty Corp. v. Newark, 119 N.J.L. 12, 194 A. 191 (E. & A. 1937); Universal C.I.T. Credit Corp. v. Paramus, 93 N.J.Super. 28, 224 A.2d 517 (App.Div.1966); Milmar Estate, Inc. v. Fort Lee, 36 N.J.Super. 241, 115 A.2d 592 (App.Div.1955); 713 Co. v. Jersey City, 94 N.J.Super. 210, 227 A.2d 530 (Law *304 Div.1967); Safeway Trails, Inc. v. Furman, 77 N.J. Super. 26, 185 A.2d 245 (Law Div.1962).[25]
Since governmental entities in this state are not constitutionally required to provide any interest on tax refunds, the fact that the Legislature has voluntarily determined to provide taxpayers with 5% interest on local property tax refunds is a fortiori valid. Neither does such voluntary determination require, from a legal standpoint, that the 5% rate be adjusted in accordance with the prevailing market rates.
Perhaps, in a given case, where the assessment exceeds true value by an amount so substantial that it may be said that the assessment is blatantly illegal the relief sought by taxpayer may be granted. The requirement to pay taxes based on such assessment in order to litigate the question in the first instance and the relatively low interest rate paid on refunds may provide the occasion which prompted Judge Learned Hand to observe in Proctor & Gamble Distributing Co. v. Sherman, 2 F.2d 165 (S.D.N.Y.1924):
[I]t seems to me plain that it is not an adequate remedy, after taking away a man’s money as a condition of allowing him to contest his tax, merely to hand it back, when, no matter how long after, he establishes that he ought never to have been required to pay at all. Whatever may have been our archaic notions about interest, in modern financial communities a dollar today is worth more than a dollar next year, and to ignore the interval as immaterial is to contradict well-settled beliefs about value. The present use of my money is itself a thing of .value, and, if I get no compensation for its loss, my remedy does not altogether right my wrong, [at 166]
See also N.Y. Susquehanna and W.R.R. v. Vermeulen, 44 N.J. 491, 503, 210 A.2d 214 (1965) and the cases cited therein. The facts and conclusions arrived at in this matter however preclude such relief.
*305 VII CONCLUSION
In view of the foregoing the total assessment will be reduced to $3,584,000 (rounded). The land and improvement components have been adjusted to reflect approximately the same percentage to the total as those components bore to the total original assessment. Judgment will be entered as follows.
Land $ 235,300
Improvements 3,348,700
Total $3,584,000

 N.J.S.A. 54:2-39 was replaced by L.1983, c. 45, approved and effective January 28, 1983, N.J.S.A. 54:51A-1b.

The within opinion represents a formalization of an oral opinion rendered on December 15, 1983.

The Director of the Division of Taxation’s school aid ratio which was available as of October 1, 1981, the assessment date herein, as perceived by the assessor.

See generally N.J.A.C. 5:24 et seq. for contents of a public offering statement.

Bin Powder Mill I Assocs. v. Hamilton Tp., 190 N.J.Super. 63, 461 A.2d 1199 (App.Div.1983) it was determined that by the adoption of L.1983 c. 45 (and the repeal of N.J.S.A. 54:2-39) the Legislature clearly intended that such payments in Tax Court appeals be governed by N.J.S.A. 54:3-27.

In Southbridge the court determined that the approach which would value the property (operated as a cooperative) based upon combining the values at which the component proprietary leases and stocks would sell was the correct methodology. The taxpayer, while contesting its validity, conceded that the assessments were correct if that method of valuation was found to be proper. Thus, the matter was disposed of on borough’s motion for summary judgment. *269 Taxpayer declined the opportunity to introduce evidence as to whether the assessments exceeded reproduction cost new.

This provision is identical to that previously found in N.J.S.A. 46:8B-19, amended L.1975, c. 2, § 1, eff. January 22, 1975.

Friedman,, Encyclopedia of Real Estate Appraising (3 ed. 1978) 283-301; American Institute of Real Estate Appraisers, Residential Condominiums: A Guide to Analysis and Appraisal (1976) 58-60 suggest that such conclusion is contrary to accepted appraisal practice.

A11 property taxes, special assessments and other charges imposed by any taxing authority shall be separately assessed against and collected on each unit as a single parcel, and not on the condominium property as a whole. Such taxes, assessments and charges shall constitute a lien only upon the unit and upon no other portion of the condominium property. All laws authorizing exemptions from taxation or deductions from tax bills shall be applicable to each individual unit to the same extent they are applicable to other separate property. N.J.S.A. 46:8B-19.

/?. 8:11, in part, provides that the small claims division will hear alteases in which the amount of refund claimed or the taxes or additional taxes sought to be set aside with respect to any year for which the amount in controversy, as alleged in the complaint, does not exceed the sum of $2,000 exclusive of interest and penalties. For the purpose of this paragraph the amount refers to the amount of tax, not the tax assessment.

While there was no testimony concerning the existence of personal property such as may be incidental to the use of the lobby, pool and parking facilities, it is not an unreasonable assumption that the value thereof would be de minimus.

Outside prices are prices generally offered to parties not residing in the building. Tenants in possession are offered inside prices. As noted previously, the assessment was based on the outside prices.

On several occasions taxpayer’s expert, a member of the American Institute of Real Estate Appraisers, referred to this publication as the ’’bible.''

Section 216 of the Internal Revenue Code permits a shareholder of a cooperative corporation to deduct the allocable portion of real estate taxes and mortgage interest from personal income on the tenant's federal income tax return. The shareholder is non-cooperative corporations owning real estate, as well as tenants in a rental apartment building, enjoy no such benefits.

The tables used in performance of the cash equivalency analysis are found in American Institute of Real Estate Appraisal Financial Tables (rev. ed. 1982).

The vast majority of other jurisdictions provide no special protection for tenants in the event of conversion. The few states that delay removal do so for much shorter periods of time than the three to eight years granted by New Jersey: CONN.GEN.STAT.ANN. § 47-88b(b) (60 days); D.C.CODE ANN. § 5 1268(b)(1) (120 days); FLA.STAT.ANN. § 718-402(2) (120 days); ILL.ANN. STAT. ch. 30, § 330(a) (120) days; MD.REAL PROP.CODE ANN. § 11 102.1(a) (180 days); MICH.STAT.ANN. § 599.204 (120 days); N.H.REV.STAT.ANN. § 356B:5611 (90 days); N.Y.GEN.BUS.LAW § 352eee(2)(d)(i) (2 years); TENN. CODE ANN. § 64 2723(a) (2 mos.); VA.CODE § 55-79.94 (90 days); WIS.STAT. ANN. § 703.08 (120 days).

Administrative regulations which are duly promulgated under properly delegated authority have the force and effect of law. Cox v. Bond Transportation, Inc., 53 N.J. 186, 249 A.2d 579 (1969); State v. Atlantic City Electric Co., 23 N.J. 259, 128 A.2d 861 (1957).

For a general discussion of the Anti-eviction Act as it applies to preexisting tenancies in converted buildings, see G.D. Management Co. v. Negri, 182 N.J.Super. 409, 442 A.2d 611 (App.Div.1982), Plaza Joint Venture v. Atlantic City, 174 N.J.Super. 231, 416 A.2d 71 (App.Div.1980) and Hampshire House Sponsor Corp. v. Fort Lee, 172 N.J.Super. 426, 412 A.2d 816 (Law Div.1979).

ReaI estate carries with it a bundle of rights to which the owner of real estate is entitled. One of the most important rights, or interests, is often referred to as the beneficial interest in the real estate; this is the right of use and occupancy of the realty. Eaton, Real Estate Valuation in Litigation (1982) 288.

The 46% figure was obviously an estimate in view of the fact that only 38 tenants had qualified as of the assessment date. The number of shares *296 allocable to the additional 12 units could not have been known and thus could only have been estimated. In the court's analysis, infra, the exact number of shares allocable to the 38 units is used.

Properly so, the share value of the underlying mortgages was not deducted in the expert's analysis due to the fact that the rents from the protected tenants offset the mortgage payments.

Based on tables found in American Institute of Real Estate Appraisal Financial Tables, supra.

In Murnick the court rejected the theory that Chapter 123 created a rebuttable presumption which was first developed in Diament v. Fort Lee, 3 N.J.Tax 70 (Tax Ct.1981) and followed in Rudd and 525 Realty. Yet, in Weyerhaeuser, the court seemingly held that its (Chapter 123) presumed correctness can be rebutted "If the figures established by Chapter 123 for the average ratio and common level are arrived at in an arbitrary, capricious, or erroneous manner, or are themselves discriminatory____” 190 N.J.Super. at 539, 464 A.2d 1156.

This conclusion assumes that taxpayer was mandated to borrow the funds necessary to meet its 1982 quarterly tax obligation. However, as the record in this case unequivocally reflects, taxpayer became aware of the 1982 assessment in March 1982 and could have required the members of the cooperative to pay additional "maintenance fees" to cover the increased tax load that would be assessed against the property. The taxpayer thus made a business decision not to utilize such an approach thereby necessitating the borrowing arrangement at *303 a 16% interest charge. However the constitutionality of N.J.S.A. 54:3-27.2 cannot rise or fall on the business judgment of a particular taxpayer.

This principle is followed in many other jurisdictions as noted in 88 A.L.R. 2d 823, 835-940 (1963); see also Public Service Co. of New Hampshire v. State, 102 N.H. 54, 149 A.2d 874 (Sup.Ct.1959); People v. Union Oil Co. of California, 48 Cal.2d 476, 310 P.2d 409 (Sup.Ct.1957); Cleveland Concession Co. v. Peck, 161 Ohio St. 31, 117 N.E.2d 429 (Sup.Ct.1954); Schlesinger v. State, 195 Wis. 366, 218 N.W. 440 (Sup.Ct.1928).