175 N.J. Super. 221 (1980)
417 A.2d 1124
BOROUGH OF FORT LEE, APPELLANT,
v.
HUDSON TERRACE APARTMENTS, ALSO REFERRED TO AS HUDSON TERRACE ASSOCIATES, RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued January 29, 1980.
Decided June 5, 1980.
*223 Before Judges CRANE, MILMED and KING.
Anthony D. Andora argued the cause for appellant (Andora, Palmisano, DeCotiis & Harris, attorneys; Anthony D. Andora, of counsel and, with Jonathan N. Harris, on the briefs).
Leo Rosenblum argued the cause for respondent (Rosenblum & Rosenblum, attorneys; Leo Rosenblum, of counsel and on the brief).
PER CURIAM.
The Borough of Fort Lee (Borough) appeals from judgments of the Division of Tax Appeals (Division) concerning local property assessments for the years 1976 and 1977 on certain real property owned by respondent Hudson Terrace Associates (Hudson).
*224 The property consists of some 4.22 acres of land designated as Block 6805, lot 3, with improvements consisting of three five-story and basement elevator apartment buildings including 20 basement level garages and a paved parking lot area, and is located on the northwesterly side of Hudson Terrace at the corner of Myrtle Avenue. It is opposite the Palisades Interstate Parkway and just north of the George Washington Bridge approach. The apartment buildings are brick-faced with metal casement windows, have steel fire escapes on each side, and flat roofs. The structures are heated by five hot-water boilers, two each in buildings A and C and one in building B. The boilers are oil-fired. All six levels of the buildings are serviced by 2,000-lb. Westinghouse electrically operated elevators. There are five elevators, two each in the buildings designated as A and C and one in building B. The buildings were completed in 1954 and contain a total of 224 rentable units, including four basement apartments. The units consist of 25 efficiency apartments, 100 one-bedroom apartments and 99 two-bedroom apartments. Each apartment is equipped with a 10 or 12-cubic-foot refrigerator, a free-standing gas range, a small complement of wall and base cabinets, and one three-fixture bath.
For the year 1976 the borough assessed the property at:

 Land $ 851,000
 Improvements 1,890,200
 ___________
 Total $ 2,741,200

These assessments were sustained by the Bergen County Board of Taxation (county board). Hudson appealed therefrom to the Division. In 1977 the borough put into effect a complete revaluation of the assessed properties in the municipality and, pursuant thereto, assessed the subject property at:

 Land $ 1,470,600
 Improvements 3,451,000
 ___________
 Total $ 4,921,600

The county board sustained the new land assessment but reduced the assessment for improvements to $1,893,825, resulting in a total assessment for the year 1977 of $3,364,425. Both the borough and Hudson appealed to the Division, challenging the county board's action.
*225 The state agency hearings on the appeals were held before Judge Savino of the Division. In regard to the subject improvements, he made findings of true value based upon an income capitalization approach using a capitalization rate comprised of "8% interest, 2% depreciation and the effective tax rate" for the year 1976, and 8% interest, 2% depreciation and the actual tax rate for the year 1977. He determined that the average ratio of 58.56% promulgated by the Director of the Division of Taxation for the year 1976 (the only year regarding which the taxpayer claimed entitlement to discrimination relief) would apply to his finding of true value for that year. His recommended findings and conclusions were adopted by the Division and resulted in the entry of the following Division judgments in the matter:

 1976 1977
 Land $ 851,000 $ 1,470,600
 Improvements 1,029,759 1,812,240
 ___________ ___________
 Total $ 1,880,759 $ 3,282,840

The borough contends that (1) the Division judge erred in denying its motion to compel the taxpayer (Hudson) and the partners thereof to produce, for the borough's inspection, certified copies of its federal and state income tax returns for the tax years involved; (2) the Division judgments "adopt an unconstitutional, non-uniform approach to assessments in the Borough"; (3) the Division judge erred "in computing the true value" of the subject improvements, and (4) the Division judge erred in applying to his finding of true value for 1976, the pertinent average ratio promulgated for that year by the Director of the Division of Taxation. In regard to the Division's application of the Director's average ratio, the borough argues that (a) the taxpayer's proofs were inadequate to sustain a finding of discrimination, and (b) the incorporation in the record of "proofs from previously tried and unrelated tax appeals constitutes reversible error."

I
We find no merit in the borough's claim that it was error to deny it access to the income tax returns of the taxpayer, *226 Hudson Terrace Associates, for the tax years involved. The fact that some investors in income-producing real estate, such as the apartment buildings here involved, actually consider the income tax benefits to be derived by them personally in deciding whether to purchase such property, or do receive such benefits, has no place or relevance in the proper determination of the true value of the property by any of the conventional approaches to value. Accordingly, no purpose would have been served by allowing the borough to inspect the income tax returns sought by its motion. It is obvious that whatever income tax benefits a taxpayer may derive from his ownership of real estate will depend upon facts peculiar to him, such as his income tax bracket for the particular year, the method of depreciation used and the current and unpredictable future provisions of the Federal income tax laws.
Affording consideration or weight to the income tax benefits which may flow to the taxpayer by reason of his particular ownership of the property, would violate the requirements of Article VIII, § I, par. 1 of the State Constitution of 1947, as well as N.J.S.A. 54:4-23, which require adherence to objective standards for determining true value. Thus, the focus must be on the value of the property in the market place, without regard to the particular or peculiar circumstances of the owner. Were this not so, adjacent parcels of land improved with identical structures might be valued differently to the extent that their respective owners' personal situations differed, even though in the open market each parcel would sell for the same price at a fair and bona fide sale by private contract  i.e., a transaction between a buyer willing but not obliged to buy and a seller willing but not obliged to sell. See Hackensack Water Co. v. Old Tappan, 77 N.J. 208, 213 (1978); New Brunswick v. Division of Tax Appeals, 39 N.J. 537, 543 (1963); Secaucus v. Damsil, Inc., 120 N.J. Super. 470, 473-474 (App.Div. 1972), certif. den. 62 N.J. 90 (1972); Glenwood Realty Co., Inc. v. East Orange, 78 N.J. Super. 67 (App.Div. 1963).
As the court pointed out in In re Estate of Romnes, 79 N.J. 139 (1979):
... "The test of market value is objective." Baetjer v. United States, 143 F.2d 391, 396 (1st Cir.1944). Or, as another court has put it,

*227 The test of fair market value is completely objective and has no reference to the peculiar position of the particular seller making the sale. [Kansas City Star Co. v. Wisconsin Dept. of Taxation, 8 Wis.2d 441, 99 N.W.2d 718, 724 (1959)]
The use of an objective standard necessarily precludes resort to any factors personal to the seller or the buyer. Courts have consistently so held.
In determining market value of the property, you should not consider any value peculiarly personal to the owners.... [Wilmington Housing Authority v. Harris, 8 Terry 469, 47 Del. 469, 93 A.2d 518, 521-22 (Super.Ct. 1952)]
A valuation limited to what the property is worth to the purchaser is not market value. [Boston Gas Co. v. Assessors of Boston, 334 Mass. 549, 137 N.E.2d 462, 473 (1956)]
The term "market value" connotes, of course, sale value as distinct from intrinsic value or value to some particular person [Columbia Gas of Kentucky, Inc. v. Maynard, 532 S.W.2d 3, 5 (Ky. Ct. App. 1975)] [at 147]
The borough's motion for production and inspection of the income tax returns was, accordingly, properly denied.

II
In estimating the true value of the improvements, each expert, viz., John O. Lasser for the borough and Leo T. Souza for Hudson, as well as the Division judge, utilized the economic (income capitalization) approach. Lasser also used the reproduction cost less depreciation approach. Here, as in Parkview Village Ass'n v. Collingswood, 62 N.J. 21 (1972), "the income approach should be of preponderant influence" in the case. Id. at 23. See, also, American Institute of Real Estate Appraisers, The Appraisal of Real Estate (7 ed. 1978), 315 et seq. It is "[t]he preferred valuation method for apartment buildings ... since investors purchase apartment buildings as income-producing properties." Helmsley v. Fort Lee, 78 N.J. 200, 213-214 (1978), app. dism., 440 U.S. 978, 99 S.Ct. 1782, 60 L.Ed.2d 237 (1979).
Leo Souza's appraisal of the true value of the land and improvements was the same for each of the tax years involved. He estimated the land value at $5,000 for each apartment unit, or a total of $1,120,000, "based on the 224 units in the project." In the process of estimating the true value of the improvements, *228 he started with an annual gross rental of $615,495, which he arrived at by multiplying by 12 the average of the October 1, 1975 and October 1, 1976 rent rolls "if fully occupied including both apartments and garages." From this he deducted "a 3% vacancy[1] and credit loss," resulting in "an effective gross apartment and garage rent of $597,030." He "then added actual average receipts from laundry and vending machines plus miscellaneous income," resulting in "a total effective gross income of $607,986." He then deducted "[s]tabilized expenses totalling $234,859 ... leaving a net income before taxes and recapture of $373,127." From this he deducted $127,568 "as the requirement to satisfy the land value of $1,120,000," i.e., $1,120,000 x 11.39%. The resulting figure, viz., $245,559 was then capitalized at 14.39% using an interest rate of 9%, plus an average tax factor of 2.39 ($3.97 tax rate X 58.56% [Director's average] ratio = $2.32 for 1976 and the actual $2.45 for 1977) and a 3% recapture. By this computation he arrived at a rounded-out appraised true value of the improvements for each of the tax years 1976 and 1977, of $1,706,500. In sum, his estimate of true value for each of the two tax years was:

 Land $ 1,120,000
 Improvements 1,706,500
 ___________
 Total $ 2,826,500[2]
John Lasser, the borough's expert, arrived at separate estimates of fair market value for each of the two tax years involved. In regard to the land, his estimated true value figures were: for 1976  $851,000 and for 1977  $1,470,600. In each case, the estimate was the same as the local assessment. In *229 estimating the value of the improvements for 1976 he started with an annual gross rental, based on 100% occupancy for the year 1975, of $598,658. He reduced this by a 2% "vacancies & rent losses" factor, resulting in a "net effective rent of $586,685." To this he added other income, including vending machine income and washing machine income, of $9,564, resulting in "effective gross income" of $596,249. He then deducted "expenses" of $202,305, leaving a net income of $393,944. He reduced this by a "return to land" of 12%[3] of $851,000, or $102,120, leaving a "net to building" of $291,824. He capitalized this at 14% (8% interest, 2% depreciation and a rounded 4% real estate tax), resulting in a rounded true value estimate for the improvements of $2,084,500.[4] In valuing the improvements for 1977 he started with an annual gross rental based on 100% occupancy for the year 1976 of $621,309. This was reduced by a 2% "vacancies and rent losses" factor, resulting in "net effective rents" of $608,883. To this he added "other income" of $9,376, resulting in "effective gross income" of $618,259. He then deducted "expenses" of $222,946, leaving a net income of $395,313. He reduced this by a "return to land" of 10.5%[5] of $1,470,600, or $154,413, leaving a "net to building" of $240,900. He capitalized this at 12.5% (8% interest, 2% depreciation and a rounded 2.5% real estate tax), resulting in a true value estimate for the improvements of $1,927,200. In sum, his estimates of true value for the tax years 1976 and 1977 were:

 For 1976 For 1977
 Land $ 851,000 $ 1,470,600
 Improvements 2,084,500 1,927,200
 ___________ ___________
 Total $ 2,935,500 $ 3,397,800

*230 The Division judge arrived at a "net income" figure of $379,301[6] for each of the tax years involved. For 1976, he reduced this by a "return to land" of 10.34%[7] of $851,000, or $87,993, leaving a "net to building" of $291,308. He capitalized this at 12.34% (8% interest, 2% depreciation and "the effective tax rate"), resulting in a true value finding for the improvements of $2,360,680. For 1977 he reduced the "net income" of $379,301 by a "return to land" of 10.45%[8] of $1,470,600, or $153,677, leaving a "net to building" of $225,624. He capitalized this at 12.45% (8% interest, 2% depreciation and 2.45% for real estate tax), resulting in a true value finding for the improvements of $1,812,240. In sum, the Division's findings of true value for the tax years 1976 and 1977 were:

 For 1976 For 1977
 Land $ 851,000 $ 1,470,600
 Improvements 2,360,680 1,812,240
 ___________ ___________
 Total $ 3,211,680 $ 3,282,840

We note here that the borough's expert made further appraisals of the property for the two tax years involved "on the basis of a tax shelter consideration," using an interest rate of 6 1/2%. He explained that
The average tax shelter benefit is approximately 3%. In order to reflect that, I've chosen to reduce the interest from 8% to 6 1/2% which would reflect a 1 1/2% percent decrease in interest rate. That would mean that the purchaser would accept a lower return on a net income because he knows he has a tax shelter benefit.
The borough complains that the Division judge "utterly ignored" Lasser's "tax shelter analysis." It notes that
Mr. Lasser explained that this type of property should be analyzed according to what the willing investor in the marketplace would pay for such property. Based upon this approach, the federal income tax benefits of ownership of residential real property must be taken into account.
*231 And, it points to the 1.5% difference in the interest rate as "the stabilized amount which accrues on account of the tax shelter benefits." We find no merit in the borough's complaint. The Division judge properly rejected Lasser's "tax shelter analysis." As we observed earlier in this opinion, the focus must be on the value of the subject property in the market place, without regard to the particular or peculiar circumstances of the owner. Beyond this, the borough expert's testimony that a 1 1/2% decrease in the interest rate should be made to reflect tax shelter benefits to the investor lacks supporting factual proofs which would justify such reduction. In the circumstances it is clear to us that the estimate of value of the property to "the willing investor in the marketplace," arrived at "on the basis of a tax shelter consideration," was not entitled to any consideration or weight in the Division.
From our review of the record submitted on this appeal we conclude that there is substantial credible evidence in the proofs to support the Division judge's findings of true value for the year 1977, i.e., land $1,470,600, and improvements $1,812,240, for a total of $3,282,840. We discern no sound basis for disturbing these findings. Accordingly, the judgment of the Division for the year 1977 under review, which incorporates these valuations, will be affirmed.
In regard to the Division judgment for the year 1976, we have concluded that there is substantial evidence in the proofs to support, on the value aspect of the case, the Division judge's findings of true value of the subject land and improvements, provided that his determination as to discrimination was appropriate. If that discrimination determination was not appropriate, then the computation of the true value of the improvements for 1976 would have to be modified to reflect the actual tax rate for that year rather than "the effective tax rate" which he used.

III
The borough maintains that the proofs are insufficient to support a finding of discrimination for the year 1976. Specifically, *232 it claims that Hudson failed (1) "to prove an absence of a common level" of assessment in the borough, and (2) "to demonstrate that its property's tax burden substantially exceeded the share allocated to other taxpayers." Judge Savino made no findings on the issue grounded on the evidence in the case. Rather, after referring to Leo Souza's testimony on the subject, he commented, "The Court recites the analysis of Mr. Souza on discrimination to complete the record in accordance with the demand of the taxpayer's attorney but also as further proof of the opinion on this issue already written by this Court." He was referring to the refusal of the attorney for the taxpayer "to stipulate the acceptance of any testimony offered on [the] issues [of discrimination, the capitalization rate, the demand for income tax returns and tax shelter benefits] in prior cases," i.e., in "1974 to 1977" tax appeal matters involving a number of large apartment houses in Fort Lee. He was also referring to an opinion which he wrote in these prior cases on the issues of discrimination and capitalization rate, which he attached to his panel report in the case now before us as "Addendum A." The borough maintains that since "[n]one of the proofs in those [prior] tax appeals were offered [in this case] by either party and no one, other than Judge Savino, sought to incorporate them into this case," his [Judge Savino's] "reliance upon the former proofs and opinion is an improper and impermissible application of the doctrine of collateral estoppel." Hudson says that it does not rely upon any evidence in any other case in support of its position in this case, and that "the inclusion of Addendum A in Judge Savino's opinion should be considered as mere surplusage." In the circumstances we discern no sound reason for Judge Savino's inclusion of that document as part of his panel report in this case. At least insofar as Hudson was concerned, his finding on the issue of discrimination in this case could not be made to rest upon evidence offered in the prior Fort Lee cases which Hudson, who was not a party thereto, "had no opportunity to test for trustworthiness or to explain or rebut." Brotherhood of R.R. Trainmen v. Palmer, 47 N.J. 482, 487 (1966). Accordingly, the issue is to be determined solely on *233 the record before us in this case without regard to "Addendum A."
Hudson casts a critical eye on a recent unpublished opinion of this court[9] in which discrimination relief was denied for the years 1973, 1974, 1975 and 1976 in six consolidated appeals covering separate apartment house properties in Fort Lee. It suggests that it was error for the court in that matter to be guided in its determination by principles set forth in Tri-Terminal Corp. v. Edgewater, 68 N.J. 405 (1975), cert. den. 425 U.S. 958, 96 S.Ct. 1739, 48 L.Ed.2d 203 (1976). It calls attention to the fact that the last revaluation in the municipality prior to 1977 was made in 1968; that it was put into effect for the 1970 tax year, and that the only year in which discrimination is questioned in this case, 1976, "is to be studied in the light of the same 1970 revaluation."
The following is the sum total of Judge Savino's "analysis" of Leo Souza's attempt to prove discrimination through three exhibits admitted in evidence:
The first exhibit (P-2) was a list of 77 sales in Fort Lee from July 1, 1975 to June 31 [sic] of 1976. The assessed value of all properties that were sold amounted to $6,214,500. The total of the sales prices was $10,676,115. The next column gave the ratio between the sales price of each parcel and the assessment.[10] This column totaled $4,582.05 [sic]. It was divided by 77 and the unweighted ratio or average of 59.51% was reached.
Mr. Leo Souza, the appraiser for the taxpayer, then explained how the coefficient of deviation is arrived at. In a fourth column he listed the deviation of each sale from the ratio of 59.51%. For example, the first sale was for $36,500, the assessment was $24,100, the resulting ratio was 66.03%. The *234 difference between 59.51% and 66.03% was 6.52%. This was done for each sale. The total of the deviations was [612.08]. This was divided by 77, resulting in a ratio of 7.95%. The unweighted ratio of 59.51 is then divided by 7.95 to reach the coefficient of deviation at 13.35%.
Mr. Souza then explained that this low coefficient of deviation indicated good assessing practice based on a common level of 59.51% and not on 100%. In fact if the coefficiency was based on 100% then the deviation total would be $3,117.95 [sic] which divided by 77 would result in 40.49%.
The second exhibit (P-3) was a chart showing that the 77 listed sales based on sales price against the assessments gave a 71.79% increase in value from 1970 to 1976. The subject property based on the expert's 1976-1977 value of $2,826,500 was an increase of only 3.11%. The chart was drawn using 1970 as the base year, that was the year of the last revaluation, and 1975-'76.
The third exhibit (P-4) was another chart showing taxes paid by 40 properties taken from the middle of the 77 sales that had a sales value of $2,823,750 and an assessed value of $1,679,000. Using the full tax rate of $3.97 total taxes paid were $66,656. The subject property assessed at $2,741,200 paid $108,825.64 in taxes. Another comparison showed that if the subject property was assessed at $1,655,200 ($2,826,500 x 58.56 ratio) its total taxes would be $65,711.38. This is almost identical to the actual taxes paid by the 40 properties taken from the sales list.
The Division judge made no mention of the testimony on the issue by John Lasser, the borough's expert. Lasser had made a study of the assessment practices of the borough assessors from the 1968 revaluation, effective for 1970, through the next revaluation effective for the year 1977. He found that "[i]t was the practice of assessors to carry forward all assessments from year to year, reflecting the 1968 base year," and that it was "the intention of the people making the assessments" to maintain the common level of the 1968 revaluation. And, to support his conclusion that the sales used by the Director of Taxation and shown on exhibit P-2 show rising property values of Class 4C (apartment house) property "that either matches or exceeds the rising value of Class 2 properties and properties generally," Lasser drew attention to the four Class 4C sales listed on the exhibit. He observed that the assessed value-sales price ratios shown for these properties, i.e., 39.73%, 48.56%, 51.17% and 57.66%, are all "below what appears to be the ratio of the combined properties" in the community. Souza, the taxpayer's expert conceded that, given the assumption that the 1970 level of assessment in the borough was at 100% of true value and that the assessments on these four Class 4C apartment house properties *235 remained unchanged from year to year, a conclusion that might be drawn from the above-mentioned ratios is that by the time of their sales in the last half of 1975 the four properties had increased in value "at a faster level or rate than the overall rate of increase and particularly the Class 2 properties . ." Beyond this, he had not appraised the subject property, using an income capitalization approach, for any of the tax years from 1970 up to 1976. Accordingly, he was not in a position to tell whether or not a rise in value would have been reflected had such approach been used throughout that period. We note here, however, that the estimates of value of the subject property which he had previously made in connection with appeals filed with the Bergen County Board of Taxation, see footnote "2" above, show a 5% rise in his total appraised true value for the one year period from 1976 to 1977. And, when he was asked on cross-examination at a Division hearing:
To the extent that increase in the value [as indicated by the abovementioned four ratios] may be true generally of Class 4C properties, 4C sales, they show that these properties do not bear a greater burden of the  greater tax burden than the properties generally in Fort Lee; don't they?
He answered "They don't," followed, without more, by his comment: "But the subject [property] does."
Given the presumptively valid common level of assessment at 100% of true value for 1970 as applied in the tax year here involved, it was incumbent upon the taxpayer to show that its property was impervious to the general rising trend in value of property in the borough or that extraordinary economic forces and passage of time created a substantial disparity between the ratio of assessment to true value in its case and the level at which properties were generally being valued in order to be entitled to discrimination relief.[11] Hudson has failed to make *236 either showing. It has not met the Kents' criterion, viz., "A taxpayer who seeks a reduction of an assessment below true value must prove that his share of the total tax burden substantially exceeds the share allocated to others generally." In re Appeals of Kents 2124 Atlantic Ave., Inc., supra, 34 N.J. at 33. And see Tri-Terminal, supra, 68 N.J. at 412.
From our review of the record in light of the above principles, we are satisfied that the required strong showing has not been made here; that the determination of Judge Savino that the average ratio promulgated by the Director of the Division of Taxation for the year 1976 would apply to his (Judge Savino's) finding of true value for that year, could not reasonably have been reached on sufficient credible evidence in the record; and that that determination was "clearly a mistaken one and so plainly unwarranted that the interests of justice demand intervention and correction." State v. Johnson, 42 N.J. 146, 162 (1964). We find from the entire record that the assessment practice in the borough was to carry forward the assessments at 100% of true value from the 1970 revaluation to the later years, up to and including the year 1976 which is involved here. Clearly, a common level existed at 100% of true value in 1970 and this level remained presumptively effective when carried forward in these subsequent years, given the borough's practice of systematic periodic revaluations. The situation here is obviously distinguishable from that found in Piscataway Assoc., Inc. v. Piscataway Tp., 73 N.J. 546 (1977), relied upon heavily by Hudson.
As indicated in Judge Savino's panel report, the borough's exhibit P-2 contained a list of 77 sales of properties in Fort Lee from July 1, 1975 to June 30, 1976. These 77 sales represented a miniscule fraction of a total of some 4,269 assessed parcels. "Isolated sales may for any number of reasons produce unduly high or unduly low prices." Tri-Terminal, supra, 68 N.J. at 413. *237 The ratios of the 77 individual sales reflect a general coefficient of deviation of 13.36%.[12]
In light of all of the above, we are satisfied that uniformity of assessment existed from the 1970 revaluation through the 1976 tax year here involved, and that resort to the Director's ratio was not warranted.

IV

Conclusion
The judgment of the Division of Tax Appeals for the year 1977 under review, is affirmed.
The determination as to discrimination relief to the taxpayer for 1976, is reversed.
The determination below with respect to true value of the subject land for the year 1976 is affirmed. The determination below with respect to true value of the subject improvements for the year 1976 is affirmed, except to the extent that the computation thereof must be modified to reflect the actual, rather than the "effective," tax rate.
*238 The matter of the assessments for 1976 is, accordingly, remanded to the Tax Court for the entry of judgment fixing such assessments at:

 Land $ 851,000
 Improvements 1,985,941[13]
 ___________
 Total $ 2,836,941

We do not retain jurisdiction.
NOTES
[1] The actual rent loss due to vacancies was less than this "stabilized estimate."
[2] Souza had previously submitted appraisals to the Bergen County Board of Taxation in which he estimated the true value of the property to be:

 For 1976 For 1977
 Land $ 851,000 $ 1,120,000
 Improvements 1,930,900 1,804,400
 ___________ ___________
 Total $ 2,781,900 $ 2,924,400

[3] Interest at 8% and real estate taxes at 4%.
[4] Additionally, using a reproduction cost less depreciation approach with a 1968 cost conversion factor of 1.64 he arrived at a 1968 depreciated improvement value of $2,030,871. His 1975 cost approach with a 1975 cost conversion factor of 3.03 and depreciation of 45% produced a total 1975 depreciated improvement value of $2,947,249. He also updated his "cost reproduction appraisal" to the year 1977 using a cost conversion factor of 3.31, and "found a depreciated improvement value of $3,214,600."
[5] Interest at 8% and real estate tax at 2.5%.
[6] Accepting the "report on the income approach offered by the taxpayer except for the vacancy rate that will be reduced to 2% instead of 3% . ."
[7] Interest at 8% plus "the effective tax rate."
[8] Interest at 8% plus the 1977 tax rate.
[9] N.R.K. Management Corp. v. Fort Lee, etc. (A-4232-77 to A-4237-77, inclusive, July 20, 1979), certif. den. 81 N.J. 401 (1979).
[10] We note here the comment by the court in Tri-Terminal Corp. v. Edgewater, supra, regarding the purposes and functions of the Director's sales ratio studies. Thus,

The purposes and functions of the Director's sales ratio studies are explained at length in Tp. of Willingboro v. Burlington Cty. Bd. Tax., 62 N.J. 203, 209-213 (1973). Their prime value lies in estimating aggregate true values of ratables in a municipality and average ratios of aggregated assessed valuations to true values, not in determining the true value of particular properties or the ratio of assessment to true value of a particular property. [68 N.J. at 410, n. 3]
[11] By definition, a taxpayer has no discrimination grievance if the standard of valuation generally applied in the taxing district, if one is discernible, is not more favorable than that which has been applied in the assessment of his property. The short-hand term generally employed since Kents [In re Appeals of Kents 2124 Atlantic Ave., Inc., 34 N.J. 21 (1961)] for the just stated standard of valuation is a "common level." [Tri-Terminal Corp. v. Edgewater, supra, 68 N.J. at 409-410]
[12] This is average deviation from average assessment ratio expressed as a percentage of average assessment ratio for [the] taxing district, calculated in the manner described in New Jersey Assessor's Manual (p. 202) for all properties included in "usable sales." ["Coefficients of Deviation A Measure of Property Assessment Uniformity  A Study by [the] Research Section and Local Property and Public Utility Branch of the Division [of Taxation]," issued by the Director of the Division of Taxation, March 1980, at p. II] Previously, a coefficient of deviation of less than 20% was usually considered good, "i.e., not reqiring a revaluation." Tri-Terminal, supra, 68 N.J. at 413, n. 4. However, the abovementioned March 1980 "Coefficients of Deviation" Study notes (at p. VI) that "General Coefficient underlies the statutory presumption (C. 123; L. 1973) that appeal against discrimination may rest upon an average ratio plus or minus 15% within each taxing district." In this regard, the Study points out that the "[p]rior assumption that a coefficient of 20 or less was acceptable has been made obsolete due to improved assessment practices," and that "[a]pproximately 3/4 of municipalities revalued or reassessed report general coefficient under 15." [Ibid.]
[13] Net income of $379,301 reduced by a "return to land" of 11.97% (interest at 8% plus 3.97% for actual real estate tax) of $851,000, or $101,865, leaving a "net to building" of $277,436. This is capitalized at 13.97% (8% interest, 2% depreciation and 3.97% for actual real estate tax) resulting in a true value for the improvements for 1976 of $1,985,941.