KAHN, J.T.C.
This action involves the appropriate assessment of an apartment house and lot owned by plaintiff-taxpayer, Maple Court Associates Limited, located in the Township of Ridgefield Park, Bergen County, New Jersey. The property is more particularly known as Block 140, Lots 7 and 9, on the official tax map of the Township of Ridgefield Park, and has a street address of 25 Teaneck Road, Ridgefield Park, New Jersey.
The assessment under review, affirmed by the Bergen County Tax Board, for the year 1981 is:
Land $129,200
Improvements $414,600
Total $543,800
The issues are valuation and discrimination. No revaluation or reassessment took place for the year in question.
The Facts
The property in question is a 34-unit garden apartment complex constructed in approximately 1968, containing 12 efficien *140 des, 16 one-bedroom units and 6 two-bedroom units. The underlying land comprises % of an acre. Parking consists of off-street parking for 17 cars on a paved, striped section in front of the apartments, as well as open parking in the rear of the complex. The building construction involves brick over wood frame with aluminum double-hung windows and screens. The units contain hardwood floors, single bathrooms, oil-fired heat, through-the-wall air conditioners, and separate electric metering for each apartment.
The municipality utilized the income-capitalization approach and sales-comparison approach. The taxpayer utilized all three recognized approaches.
Taxpayer emphasized the income-capitalization approach, and further urged that serious attention be accorded the analysis of the prior sale of the subject property. The municipality likewise urged greater emphasis on the income approach.
With regard to the cost-reproduction approach, taxpayer’s expert witness utilized the Marshall & Swift, Marshall Valuation Service (1981). He classified the subject as a building E, which is a low class-section 12. According to the witness, he made adjustments for the floor area with current and local cost multipliers. He also indicated an adjustment was necessary for the heating plant. The witness concluded, for the 1981 tax year, a reproduction cost of $635,477 for the apartments, $21,-225 for the basement and parking area and $7,038 for the utility area (total: $663,740). The witness indicated the necessity of deducting depreciation and obsolescence in all forms of 40%, resulting in an adjusted reconstruction cost of $398,244. To that figure, he added $60,000 for paving and porches, with no adjustments thereto, making a total building value of $458,244, as of October 1, 1980.
With respect to the land, the witness analyzed several sales of vacant land zoned for multi-family dwellings. The properties considered were located in Hackensack and the witness further indicated that he could find no comparable properties in the Township of Ridgefield Park. Taxpayer’s analysis outlined a *141 time adjustment of 8% a year where applicable, and a 10% adjustment for locational differences. The result of the analysis was a unit of comparison cost and when applied to the subject property, amounted to a land valuation of $149,600 for 1981.
Taxpayer’s total valuation for 1981, based upon the reproduction approach, was computed by adding the appraiser’s estimated land value of $149,600 to his aforementioned building value of $458,244 for a total of $607,844.
Taxpayer’s use of the sales-comparison analysis involved the sale of the subject property on September 19, 1979, wherein taxpayer herein purchased same. The pertinent facts of this sale are as follows:
a. Total consideration: $775,000;
b. Cash downpayment: $150,000;
c. Assumption of $180,000 mortgage due September 1, 1989 with a 10-year payout, amortized over 25 years, 10'A7» interest rate, monthly payments $1,667.50 and a balloon payment of $152,985.51;
d. Purchase money mortgage of $395,000 at 6% interest, due September 17, 1991. Monthly payments of $1,975.00 for the period October 17, 1979 to September 17, 1981 and payments of $2,332.50 thereafter until September 17, 1991. At that time a balloon payment of $337,060.40 will be due;
e. Purchase money mortgage of $50,000 due January 2, 1980 at 8% interest.
Cash Equivalence Calculation
$150,000 cash downpayment $150,000
$1,667.50 X 67.640780 (1)[1] 112,791
*142 $152,985.51 X .281317 (2) $ 43,047
$1,975.00 x 21.086156 (3) 122,425
$2,332.50 X 52.486512 (4) 122,425
$337,060.40 X .218290 (5) 73,577
$50,000 X .958605 (6) 47,930
Discounted value of purchase price as of September 17, 1979: $591,405
The witness testified to his analysis of the cash equivalency utilizing what he described as a conservative 12%% mortgage rate as a market standard. This standard was based upon a review of the American Council of Life Insurance Underwriter’s tables and benchmarks from the Society of Real Estate Appraisers annexed to the witness' appraisal. He indicated that he also relied upon his experience with institutional financing, as well as upon a letter received from a local banking institution which indicated that mortgages available for financing properties similar to the subject amounted to two % over prime as of October 1979. This date fairly coincides with the previous sale of the subject property. The prime rate in 1979 was slightly over 13%, which based on the bank’s letter, would create an interest rate of 15% to 15V2%.
The witness’ analysis involved a discounting procedure utilizing the monthly mortgage payments and applying the present worth of an ordinary annuity factor, which resulted in present day cash equivalence. Each of the several mortgages outlined in 1979 as part of the purchase price created an ordinary annuity or Inwood factor which was utilized by the witness to analyze the financing. The cash for the purchase price was $150,000 at the time of the sale, which, of course, required no analysis. The final result of taxpayer’s analysis amounted to the present worth in September 1979 of cash plus all the financing in the amount of $591,405, rounded to $591,400.
A comparison of the use of the income-capitalization approach by the parties must begin by setting forth a consideration of the projected income and expenses. The income and expense *143 statements proposed by the parties for October 1, 1980 are set forth below:
Municipality
Taxpayer
October 1, 1980
Income and Expense Statement:
Potential Gross Rental Income 2% Vacancy & Rent Loss Factor Rental Income Laundry Income Garage (& other) Income Total Gross Income
Expenses:
Management $ 7,891
Wages 4,800
Fuel 14,251
Electric & Gas 3,403
Water 1,723
Repairs & Maintenance 4,635 Insurance 1,874
Parking Lot Rental 1,725
Professional Fees 1,679
Trash Removal 1,290
Mise. & Telephone 826
Total Expenses $ 44,097
Net Income before Real Estate Taxes $103,731
$146,400 Income $129,956
— 2,928 Less Vacancy &
$143,472 Credit Loss - 181
1,190 Less Superintendent’s
3,166 Lodgings - 1,600
$147,828 Effective Gross
Income $128,175
Other Income:
Laundry 1,190
Miscellaneous 3,166
Total Gross
Income $132,531
Management (5%) $6,627
Wages & Payroll Taxes (Actual) 2,990
Fuel (Actual) 15,343
Electrical (Actual) 2,311
Water & Sewerage (Actual) 1,723
Repair & Maintenance (Avg. 1980/81/82) 5,497
Professional Fees &
Advertising (Avg. 1980/
81/82) 1,227
Insurance (Actual) 1,874
Trash Removal (Actual) 1,290
Mise. (Avg. 1980/81/82) 2,625
Telephone (Actual) 260
Reserves for Replacement (3%) 3,976
Total Expenses 45,743
Net Income before Capital Requirements & Taxes $86,788
The major difference between the two parties involves the establishment of economic rent for the subject property during *144 the years in question. Taxpayer’s witness indicated that the actual rents for the year prior to the tax year should be considered economic because, in his opinion, the building was well-managed and rent control existed at all relevant times. He stated that he was familiar with the management company operating the property, had done work for them and was satisfied that they always maximized rents and minimized expenses. He, therefore, concluded that the actual rents should be considered economic. The witness indicated, however, that he did not verify the rents and expenses independently other than to review work sheets given by the management company. He also stated that he did not analyze rentals for similar properties in the area, nor did he appraise any like properties in the area.
The expert witness for the municipality presented a schedule of rentals for buildings allegedly similar in age, size and description in the same municipality, which demonstrated comparisons of rentals for efficiencies, one-and two-bedroom apartments. He indicated that, in his opinion, the subject property’s rentals were lower than the prevailing rentals of these comparable properties. He concluded that for 1980 the rental for efficiencies prevailing in the market place was $250, one-bedroom apartments was $300, and two-bedroom apartments was $350. In applying those prevailing rents to the units in the subject premises for 1980, the witness opined that economic rent was higher than the actual rents set forth by taxpayer. A comparison of the rentals urged by the parties for the year in controversy is set forth on previous pages.
With respect to expenses, taxpayer’s expert utilized the actual vacancy and credit loss which amounted to less than one % of gross rentals for both years in question. The municipality in its analysis projected a two % vacancy and credit loss for the year in question. In expenses' to be deducted from gross income, the parties showed little inconsistency; most of the actual items of expenses were utilized by both parties and those expenses stabilized as a percentage of gross income would fluctuate depending upon the rent utilized by the parties. *145 Some expenses were averages for the years 1980, 1981 and 1982. The municipality’s adjustments for expenses were based upon opinions by the expert as to percentages of gross income or square footage; however, these adjustments do not vary much from the expenses utilized by taxpayer.
With respect to capitalization, both parties utilized an overall rate concept. Taxpayer more specifically employed a mortgage-equity technique which consisted of an overall capitalization rate, including a mortgage portion, equity portion and effective tax rate.
For the year 1981 (assessment date of October 1, 1980), taxpayer’s witness suggested that an appropriate mortgage for the purchase of the subject property would be at a rate of 12%% interest for 20 years, which would comprise 75% of the purchase price. As additional support for his opinion, the witness produced a letter from a local bank, indicating that loans for purchases of similar properties would be at a rate of two points over the prime rate. The witness indicated that the prime rate at that time was approximately 10V2%. With respect to the equity portion of the capitalization rate, the witness stated that based upon comparisons with competing investments such as securities and the like, an investor would require a 10% return for his 25% downpayment.
In support of taxpayer’s position, the witness referred to the addenda of his appraisal consisting of various tables provided by the American Council of Life Insurance Companies. The effective tax rate of 2.95%, of course, is not in dispute. With respect to the mortgage, a 75% mortgage for 20 years at 12%% interest would provide a 13.85% mortgage constant, which would result in a 10.04% mortgage factor. The 25% equity at 10% would provide a factor of 2.50%. Adding the 2.95% effective tax rate factor results in a 15.49% overall capitalization rate (10.04 + 2.50 + 2.95). Dividing the respective capitalization rate into the net operating income (86,788 divided by 15.49%), taxpayer’s witness formulated a value by the capitalization approach in the amount of $560,300 as of October 1, 1980. He *146 then concluded by analyzing the values obtained by the various methods and rendered an opinion that the subject property’s fair market value as of October 1, 1980 was $600,000.
In utilizing the income approach to value, the municipality’s expert attempted to derive an overall capitalization rate from the market place. He presented six sales of what he described as comparable apartment buildings, all of which were located in Ridgefield Park. The sale dates ranged from November 1979 to February 1983. These sales were used by the witness for both the derivation of his capitalization rate and. as comparable sales under a market-sales approach which will be hereinafter discussed. The witness took each sale price, divided it into the appropriate net income and formulated a range of capitalization rates from 8.9% to 12%, the majority of which ranged between 11.3% and 12%. The witness indicated that, because of the age of the subject building and the stable operating expenses, an 11.5% overall capitalization rate would be appropriate for October 1, 1980. He also indicated that the real estate tax factor was included in this rate and no further computation would be necessary.
No adjustments were made for the financing on the property at the time of sale, although each of the sales was based upon a cash downpayment plus financing at varying rates. The witness indicated that his net income on the comparable properties was based upon inclusion of taxes as an expense against income; however, he did not deduct taxes when applying the capitalization rate to the net income of the subject property for the year in question. Based upon this witness’ use of the capitalization rate of 11.5%, his finding of value under the income capitalization approach as of October 1, 1980 was $902,-008 ($103,731 divided by .115). In reviewing his capitalization approach under cross-examination, and recalculating the net income after deducting taxes as an expense and capitalizing it by 11.5%, the witness indicated that as of October 1, 1980, the value would be $725,500.
*147 The witness for the municipality also utilized a market-sales approach to value with the same six sales, adjusting for time, age and condition, coming up with various adjusted unit values as of the assessment dates. Adjustments ranged from 0% to 60%. Since all comparable properties were located in Ridgefield Park, he made no location adjustments. He indicated that there were no significant size differentials as to apartments and, therefore, no size adjustments were necessary. The time adjustment was based on a ten % annual adjustment wherein a comparable sale took place prior or subsequent to the relevant assessment dates. His analysis of the present unit sale price of the comparables resulted in a $24,200 a unit value for the subject property or $822,800 as of October 1, 1980. The witness also indicated a ten % appreciation from October 1,1980 to October 1, 1981.
The witness reconciles the approaches utilized by stating that the income-capitalization approach is more indicative of the method by which a prospective purchaser would analyze the property.
With respect to the assessments for the year 1981, the average ratio is 74% with an upper limit of 86% and a lower limit of 62%. In computing the positions of the respective parties, taxpayer’s statement of valuation would place the assessment-to-value ratio above the upper limits, therefore, requiring relief:
1981 — Assessment, $543,800 _
_ True Value $600,000 ~ ' °
With respect to the municipality’s opinion, the assessment to value ratio would be below the lower limit, requiring the court to increase the assessment:
1981 — Assessment $543,800 __ „„„
__ True Value $900,000 ” °
Discussion
A. The Income Approach
It is well settled that overwhelming reliance has been placed on the capitalization of income approach in valuing income *148 producing properties, such as apartment buildings. Helmsley v. Fort Lee, 78 N.J. 200, 394 A.2d 65 (1978), app. dism. 440 U.S. 978, 99 S.Ct. 1782, 60 L.Ed.2d 237 (1979); Parkview Village Assocs. v. Collingswood, 62 N.J. 21, 297 A.2d 842 (1972); Fort Lee v. Hudson Terrace Apts., 175 N.J.Super. 221, 417 A.2d 1124 (App.Div.1980), certif. den. 85 N.J. 459, 427 A.2d 559 (1980); Center-Whiteman Corp. v. Fort Lee, 4 N.J.Tax 153 (Tax Ct.1982); Rudd v. Cranford, 4 N.J.Tax 236 (Tax Ct.1982); G & S Co. v. Eatontown, 2 N.J.Tax 94 (Tax Ct.1980); Jefferson House Investment Co. v. Chatham, 4 N.J.Tax 669 (Tax Ct.1982).
Clearly, a purchaser of income producing real estate would be more inclined to analyze the value of property by a thorough examination of income and expenses. Parsippany Hills Assocs. v. Parsippany-Troy Hills, 1 N.J.Tax 120 (Tax Ct.1980); G & S Co. v. Eatontown, supra; Herman Holding Corp. v. Montvale Borough, 5 N.J.Tax 199 (Tax Ct.1983). Since both parties to this action gave detailed consideration to the income-capitalization approach, it would be appropriate to consider the merits of this approach first. The remaining approaches will then be examined to see whether they assist in confirming the court’s findings.
The income-capitalization approach is not an independent system of valuation that is unrelated to the other methods of valuation. American Institute of Real Estate Appraisers, The Appraisal of Real Estate (8 ed. 1983) at 333. This case deals with property located in a rent control district. It has been held that the effect of rent control is reflected through the income approach. Parsippany Hills Assocs. v. Parsippany-Troy Hills, supra at 123.
a. Economic Rent
The beginning point of any inquiry into the income-capitalization approach is the income, or in the context of income-producing property, the rent received by or attributed to the taxpayer. *149 In this case, the parties greatly differ as to what rent should be allocated to the subject property for the years in question.
In developing a gross rental income estimate, the initial inquiry is to calculate “economic” rents. In a recent case, First Real Estate Investment Trust v. Borough of Hasbrouck Heights, 190 N.J.Super. 85, 461 A.2d 1210 (App.Div.1983), certif. den. 95 N.J. 202, 470 A.2d 423 (1984), the Appellate Division addressed the applicable principles as follows:
As Judge Gonford observed in his opinion for a unanimous court in Parkview Village Assoc. v. Collingswood, supra:
“It is of course settled that gross rental income for purposes of applying the capitalized income approach to valuation of property is to be taken at ‘fair rental value’, professionally termed ‘economic’ rent or income, if that differs from current actual rental, [citations omitted] However, actual income is a significant probative factor in the inquiry as to economic income, [citations omitted]
Checking actual income to determine whether it reflects economic income is a process of sound appraisal judgment applied to rentals currently being charged for comparable facilities in the competitive area. The essential, however, is a plurality of comparables, see The Appraisal of Real Estate, supra, at 235; ‘ ”
And, as pointed out in The Appraisal of Real Estate, supra:
“A gross income estimate is basic to the income approach to a value indication, but since this estimate involves future projections, adequate and dependable current market research is basic to the gross income estimate. The future cannot be forecast with certainty, but trends can be analyzed and current market actions can be identified which affect future income expectancies. Appraisal practice requires that appraisers study and identify important supply and demand relationships. Such analyses are critical to income forecasting and evaluation of risks.
The starting point in a gross income projection is the record of actual gross income from the property in past years and the current income schedule. This historic and current factual data provides a basis from which a projection of estimated future gross income may be developed. However, this projected gross income estimate for appraisal purposes may be quite different from actual past or current figures. In the review and analysis of the factual data, comparison is made with known rentals for similar space in the same or comparable locations. This analysis leads to an informed estimate of the probable prospective income from the property and the degree of risk involved in its realization. [At 325.]”
Here there obviously was no concern given by plaintiff’s expert to arriving at “an informed estimate of the probable prospective income from the property” by comparison of the rental therefrom “with known rentals for similar space in the same or comparable locations.” Ibid. He merely equated current actual rental with economic rent because of the Borough’s rent stabilization ordi *150 nance while offering no proof whatever to establish whether the $44,645 gross annual rentals for 1973, the year immediately preceding the adoption of the Borough’s rent stabilization ordinance and only 21 months before the October 1, 1975 assessment date, was the then fair rental value____ [at 89-90; emphasis supplied]
Case law confirms the fact that the concept of economic rent requires a different analysis in a rent-controlled community as opposed to one without rent control. In a community without rent control, comparison of rents payable at comparable properties in the competitive area for the period in question should be made. Rodwood Gardens Inc. v. Summit, 188 N.J.Super. 34, 455 A.2d 1136 (App.Div.1982).
In the present case, taxpayer presented evidence as to the actual rents achieved and concluded that same are economic. Taxpayer’s expert rendered this opinion based on conversations with a representative of the management company for taxpayer, who indicated that rents were being maximized under the terms of the rent-control ordinance. The witness also relied on his opinion that the management company maximized rentals. He failed to independently determine whether said rents were being maximized. He further failed to verify the opinion and representations of the management company as to maximization of rental.
Taxpayer made no inquiry to verify (1) the previous years’ rents prior to the assessment date of October 1, 1980, (2) the rents charged as of the assessment date of October 1, 1980, (3) past or historic rents of Maple Court Associates, (4) rents charged prior to 1974, the year rent stabilization became effective in Ridgefield Park or (5) whether rents charged at Maple Court met the standard of “fair rental value.” Rodwood Gardens, Inc. v. Summit, supra, 188 N.J.Super. at 41, 455 A.2d 1136. In effect, there was no effort on plaintiff's part to arrive at “an informed estimate of the probable prospective income from the property” by a comparison with “known rentals for similar space in the same or comparable locations.” Id., 188 N.J.Super. at 43, 455 A.2d 1136, citing American Institute of Real Estate Appraisers, The Appraisal of Real Estate (7 ed. 1978). He nevertheless concluded that rents were maximized *151 and opted to base his analysis on his interpretation of Borough of Hasbrouck Heights v. Park Terrace Gardens, an unreported decision in which the Tax Court held that the Borough did not support its claim that actual rents were not economic.[2]
The expert witness for the taxing district on the other hand, analyzed the rentals for several apartment house properties for the year under review. The witness compared the physical characteristics of the buildings and units of the comparables to the subject property and concluded that the taxpayer was not receiving economic rents for the subject premises. This witness, therefore, proceeded under the authority of First Real Estate v. Hasbrouck Heights, supra, which required a comparison of rentals “with known rentals for similar space in the same or comparable locations” as a prerequisite for rendering an opinion as to economic rent attributable to the subject property. Id., 190 N.J.Super. at 90, 461 A.2d 1210.
The weight to be given the opinion of an expert is dependent upon the facts and rationale which form the foundation for that opinion. Berkeley Development Co. v. Berkeley Heights Tp., 2 N.J.Tax 438 (Tax Ct.1981); In re Port of New York Auth., 28 N.J.Super. 575, 581, 101 A.2d 365 (App.Div.1953). I find that the analysis rendered by the municipality’s expert, as it was based upon a study of the market place, provided a better indication of economic rent than the opinion rendered by the taxpayer. It is axiomatic that the best information for analysis as to valuation for properties bought and sold regularly is that which is derived from the market place itself. The Appraisal of Real Estate, supra at 311. Certainly under ease law actual income is a significant probative factor in the inquiry as to economic income. See McCrory Stores Corp. v. Asbury Park, 89 N.J.Super. 234, 243, 214 A.2d 526 (App.Div.1965); Somers v. City of Meriden, 119 Conn. 5, 174 A. 184 *152 (Sup.Ct.1934); People Ex rel. Gale v. Tax Commission of City of New York, 17 A.D.2d 225, 233 N.Y.S.2d 501, 506-507 (App.Div.1962), motion for leave to app. den. 12 N.Y.2d 646, 238 N.Y.S.2d 1026, 188 N.E.2d 529 (Ct.App.1963); Real Property Appraisal Manual for New Jersey Assessors (2 ed. 1963) at 148. Taxpayer’s witness, in addition to his failure to verify whether the taxpayer maximized rents under the rent control ordinance, admitted unfamiliarity with the Village of Ridgefield Park and further indicated that he never conducted any appraisals of property in that municipality. The basis for the taxpayer’s witness’ conclusion in this case as to economic rent was limited solely to his opinion that actual rents are automatically economic in a rent-control community. In the face, however, of the municipality’s evidence based upon an analysis of the market place, including numerous buildings of the same age and type proximate to the subject property, taxpayer’s opinion fails. Although the municipality’s expert’s testimony revealed that there were in fact differences in the size of the units in the comparables which were larger than the units in the subject property, and although the witness did not make specific adjustments for size, I find sufficient evidence from his market study of comparables that the actual rents offered by the taxpayer are not economic. I conclude, therefore, that the potential gross rental to be attributed to the subject property for the year 1981 is $146,400.[3]
With respect to vacancy and credit loss, the taxpayer utilized alleged actual vacancy and credit loss while the municipality posited two % of the gross rental. The vacancy allowance is usually estimated as a percentage of potential gross income, The Appraisal of Real Estate, supra at 361, and its *153 selection is influenced by the quality and durability of projected rental income and by typical vacancy levels, as revealed by the present and past experience of the property and by market surveys of similar properties under similar conditions. Newark v. 1013 Corp., 1 N.J.Tax 107 (Tax Ct.1980).
I find that a two % vacancy and credit loss is supported by evidence submitted and is fair and reasonable under the circumstances. I also accept the laundry and garage income received by taxpayer of $1,190 and $3,166 respectively. The total gross income that I find as received by and attributed to taxpayer is as follows:
Potential Gross Rental $146,400
Vacancy & Credit Loss —2,928
Rental Income $143,472
Laundry Income 1,190
Garage Income 3,166
Effective Gross Income $147,828
The parties did not differ in any significant manner with respect to expenses. Taxpayer utilized, for the most part, actual expenses which in some places were averaged over a three year period (1980-1982). Some expenses were stabilized by a percentage such as management and reserves for replacements. The taxing district adjusted some expenses on a unit basis and primarily took issue with the taxpayer’s use of a reserve for replacements. I find that actual expenses should be considered where there is no dispute as to the existence of the expenses and where the expenses are within reasonable limits and do not constitute an inordinate percentage of effective gross income. The use of both actual and stabilized expenses is acceptable appraisal practice. Rudd v. Cranford Tp., 4 N.J.Tax 236, 244 (Tax Ct.1982); Skytop Gardens Inc. v. Sayreville Bor., 3 N.J.Tax 187, 194-196 (Tax Ct.1981).
In this case, I need only adjust the insurance expense. Taxpayer utilized actual figures; however, consistency requires that these figures should be stabilized and averaged over the same three years as other expenses. I also find that a three % *154 reserve for replacements is adequately demonstrated by the testimony of taxpayer’s witness and is a legitimate consideration. See The Appraisal of Real Estate, supra at 368-370. My conclusion as to the propriety of these expenses is clearly bolstered by the fact that said expenses form approximately 30% of effective gross income and are clearly supported by the evidence. I, therefore, find the following expenses are appropriate to be deducted from effective gross income:
Management (5%) $ 7,391
Wages 2,990
Fuel 15,343
Water & Sewer 1,723
Repair & Maintenance 5,497
Professional Fees & Auditing 1,277
Insurance (7979) 2,659
Trash Removal 1,290
Mise. 2,625
Telephone 260
Reserves for Replacement (3%) 4,434
Total $47,750
Deducting these expenses results in a net operating income of $100,078 for purposes of capitalization for the year 1981.
b. Capitalization Rate
The parties differ greatly in their approach to the capitalization rate. Taxpayer utilizes a mortgage-equity technique dividing the rate into three parts—mortgage, equity and effective tax rate. The witness indicated that an investor would obtain a mortgage for 75% of the purchase price and would be required to invest 25% of the purchase price from his own funds. He postulates a 12%% mortgage for a 20-year term which translates into a 13.85% annual constant, 75% of which is 10.04%. For the equity portion, the witness indicated that an investor would require a 10% return on his 25% invested capital which translates into a 2.50 factor (25% X 10%). The tax rate for the year in question is 3.99%; however, the average ratio of 74% for the year in question renders the effective tax rate 2.95% (74% x 3.99). The total of the three factors results in a total *155 capitalization rate of 15.49%. In support of this capitalization rate, the witness relied upon a number of exhibits attached to his appraisal, which consisted of the American Council of Life Insurance Companies’ tables for various sections of the country. These tables set forth mortgage interest rates, capitalization rates and similar information in estimating the value of property.
The taxing district’s expert, as aforesaid, attempted to draw his capitalization rate on an overall basis from the market place, which he discussed with respect to his opinion relating to economic rent. He testified as to the examination of six sales of what he deemed to be comparable apartment properties in the same municipality as the subject. His analysis was based upon dividing the selling price by the net income received by each property.
I find that although there was sufficient authority for the use of the market place to render a capitalization rate, The Appraisal of Real Estate, supra at 51-53, the witness’ analysis and conclusion were incomplete and, therefore, not supportable. The taxing district’s appraisal set forth a summary of the six sales he utilized. In each of those sales, there was no indication of income to expense ratios. There was, however, a general description of the financing for each sale. The witness did not analyze the financing from a “cash equivalency point of view.” He failed to indicate whether such an analysis would change the cash value of the selling price for all or any of the comparables. Obviously, if such analysis would change the value of the selling price, the capitalization rate based on said sales would be affected.
Based on a review of the financing description of the itemized comparable sales, I cannot accept the municipality’s analysis without an appropriate analysis of the financing. For this conclusion, I also rely upon the evidence before me including various documents and authorities relied upon by taxpayer’s appraiser in determining the availability of financing at a higher rate during most of the periods covering the *156 comparable sales. In determining the overall capitalization rate, a higher degree of uniformity among the properties must be considered. Akerson, Capitalization Theory and Techniques, (4 ed. 1984) at 17.
I also find that the fact that real estate taxes were deducted as an expense to determine the net income of the comparables required the analyst to consider real estate taxes in a like fashion when applying the comparables to the subject property. In essence, the witness, on this point, failed to compare apples with apples. He opined that the market place produced a capitalization rate of 11.5% based on a range of 8.9% to 12%. It is the opinion of this court that in order to make an appropriate comparison, the witness should have added to the 11.5% overall rate the effective tax rate for the year in question, 2.95%. Assuming also the possibility that the selling prices of the comparables should be adjusted by a cash equivalency study, such study would, therefore, have an effect on the overall rate received from the sales. Although a market study is appropriate, there is insufficient testimony and evidence to support the municipality’s conclusion as to the appropriate capitalization rate.
There is, however, sufficient authority for the use of the mortgage-equity technique utilized by taxpayer. The Appraisal of Real Estate, supra at 393. The opinion of taxpayer’s witness as to the mortgage portion of the rate is reasonably supported by the addenda to his appraisal, his opinion based upon a letter from the Interchange State Bank and his experience in financial real estate transactions during the time periods in question. Certainly, the mortgage portion is a conservative estimate based upon the information submitted by taxpayer.
With respect to the equity portion of taxpayer’s capitalization rate, the only evidence before me is taxpayer’s witness’ opinion that based upon his experience representing owners and managers of property, a ten % return would be required by investors. The taxing district’s witness did not utilize the mortgage- *157 equity technique; however, he rendered an opinion that the requirement of an equity dividend for an investor would be much less. His support for this proposition were the comparable sales set forth in his appraisal concluding that this was the market place. He did not produce any evidence that institutional financing was unavailable. He concluded that an overall rate was appropriate without separate findings as to a division between mortgage and equity factors. The court, however, finds more support for the opinion rendered by taxpayer’s witness. By merely adding to the municipal expert’s 11.5% capitalization rate a tax factor (for example, 2.95% for the year 1981), the capitalization rate then becomes 14.45%, and I have already concluded that a cash-equivalency study on the municipality’s proffered comparable sales could affect the capitalization rate drawn from those sales. All the evidence and testimony indicate that the financing of the comparable sales was below market. It follows then that the adjusted sale prices of the comparables would be lower than the actual numerical consideration. This would have an effect on the capitalization rates derived from the comparable sales, rendering them higher. Although there is not sufficient evidence for me to formulate an adjusted capitalization rate, based on the municipality’s evidence, it is obvious in my opinion that some upward adjustment would have to be reflected in the municipality’s analysis.
I find then that the appropriate capitalization rate to be utilized to form the basis of an income valuation of the subject property for the year 1981 is as follows:
Mortgage portion 10.04%
Equity portion 2.50%
Tax factor 2.95%
Total 15.49%
Thé total of 15.49% when divided into a net operating income of $100,078, equals a valuation of $646,081 ($646,100 rounded).
B. Analysis of Subject Sale: Cash Equivalency
Although the court primarily relies upon the income-capitalization approach, the parties also submitted alternative theories for valuation.
*158 Taxpayer placed a great deal of emphasis on a review of a September 17, 1979 sale of the subject property, whose pertinent facts were described previously.
Taxpayer’s witness analyzed the sale under a cash-equivalency theory that the present worth of the consideration was far less than the numerical consideration of $775,000. Under this analysis, he utilized a mortgage rate of 12%% which was obtainable at the time of the sale.
I find support for the use of a cash-equivalency analysis from the fact that the financing utilized for the September 1979 sale of the subject property was clearly below market. The Appraisal Of Real Estate, supra at 304. The municipality’s witness argued that other financing was unavailable and, therefore, the actual financing was market financing. The weight to be given to the opinion of an expert witness is dependent upon “the facts and reasoning” offered as a basis of an opinion. Schmertz v. Dover Tp., 4 N.J.Tax 145, 151 (Tax Ct.1982), citing Passaic v. Gera Mills, 55 N.J.Super. 73, 90, 150 A.2d 67 (App.Div.1959). The witness, however, offered no evidence for this position other than his own opinion. The opinion of taxpayer’s witness, along with other information annexed to the appraisal, require me to conclude that financing of at least 12%% was available in and around September 1979. I find 12%% mortgage financing to have been available in September 1979, and, therefore, “market” for cash-equivalency analysis purposes.
Taxpayer’s approach, however, is incomplete. Nowhere does taxpayer’s witness provide any adjustment between the time of the sale (September 17, 1979) and the assessment date herein (October 1, 1980). In effect, the witness’ testimony must be construed to suggest that either there was no appreciation or that appreciation of the subject property should not be considered. The reverse is clearly true. The municipality’s witness in discussing his market sales approach (discussed at length hereinafter) indicated a time adjustment of ten % a year. This is more than supported by his sale # two. The date of the *159 first sale of comparable #two was March 18, 1980 for a consideration of $165,000. The second sale was July 2,1981 for $264,000. Taxpayer’s witness on the other hand stated only that he utilized an eight % appreciation factor for land, which opinion was rendered relative to his discussion of the reproduction approach. Taxpayer’s expert rendered no specific opinion as to appreciation relative to land and building combined. I note from the record, however, that taxpayer’s expert’s opinion as to valuation suggests a five % appreciation between 1981 and 1982.
Taxpayer’s cash-equivalency analysis is incomplete. The testimony concerning annual appreciation corroborated by the facts concerning the municipality’s comparable sale #two requires me to find the existence of annual appreciation at a rate of ten %. For the assessment date of October 1, 1980, I find that the sum of $59,140 must be added to taxpayer’s valuation of $591,400, making a total of $650,540. I determine this to be an appropriate valuation under the taxpayer’s market-sales analysis. This analysis is well supported by the record and provides a close check and corroboration of the court’s findings under the income-capitalization approach for the assessing date October 1, 1980.
C. Market Sales Approach
The taxing district urged the court to give consideration to its market comparison study which includes sales of allegedly similar properties located in Ridgefield Park. Although the dates of the comparable sales were well within reason and some of the buildings themselves appear to be comparable from a construction point of view, the municipality’s appraiser utilized severe adjustment factors in some instances in order to arrive at an adjusted unit value. Three of the six sales contained an age and condition adjustment of 50% and one, 60%. One of the comparables was constructed in the year 1906, three of them in the 1920’s, one in 1957, and one in 1967. Comparable sale # three contained no adjustments what *160 soever with the exception of a time adjustment of minus 7.5% by reason of the sale having taken place in July 1981, and the assessment date for the subject property being October 1, 1980. Obviously, this property was most comparable in all aspects and required the least adjustment. The adjusted unit value for that one sale was $13,605, which when multiplied by 34 units comes out to a total value of $462,570. The other five sales, as adjusted, range from $22,000 to $26,500 a unit. The witness concluded a unit cost of $24,200 which would have produced a value of $822,800 for the subject property. It appears that the municipality’s witness eliminated the most comparable property from his calculations and conclusion. The sales approach is often effective in determining value for property tax purposes, but only where there is a substantial similarity between the properties which permits a reasonable comparison. Newark v. West Milford, 9 N.J. 295, 88 A.2d 211 (1953); Diament v. Fort Lee, 3 N.J.Tax 70 (Tax Ct.1981); Venino v. Carlstadt, 1 N.J.Tax 172 (Tax Ct.1980). It is the opinion of this court that, the market-sales approach utilized by the municipality did not provide a value which is helpful in either determining- value of the subject property or supporting the more significantly proposed approaches. Capitalization Theory and Techniques, supra at 24; The Appraisal Of Real Estate, supra at 284.
D. Cost Reproduction Approach
The remaining approach utilized was the cost-reproduction approach offered by the taxpayer. The cost-reproduction approach frequently lacks reliability when applied to buildings the age of the subject property—nearly 20 years. The cost-reproduction approach also requires an independent valuation of land. The older the building the greater the adjustments for depreciation, physical and functional obsolescence. The Appraisal of Real Estate, supra at 441-450. Without going into great detail, taxpayer’s approach resulted in a valuation of $607,800 as of October 1, 1980. The result based upon this approach, although not substantially different from the value conclusion through other approaches, must be discarded *161 as an independent means of valuation of the subject property. The age of the building, together with the greater amount of evidence concerning other appraisal techniques, require this court to exclude the cost-reproduction approach in this case.
Accordingly, for the reasons set forth above, I find that the true value of the subject property for the year 1981 (assessment date October 1, 1980) is $646,100. For the year 1981, the average ratio was 74%, the lower limit 62%, and the upper limit 86%. When applying the court’s finding of true value to the assessment ($543,800 divided by $646,100), the result is 84% which falls within the corridor between the upper and lower limits of the Director of the Division of Taxation’s ratio. Accordingly, taxpayer’s claim of discrimination is denied and the assessment on the subject property for the year 1981 is affirmed.
I hereby direct the Clerk of the Tax Court to enter judgment affirming the assessment for the year 1981 as follows:
Land $129,200
Improvements $414,600
Total $543,800

 Numbers in parentheses refer to respective steps in the discounting process as follows:
(1) Present value ordinary annuity—10 year factor
(2) Present value reversion—10 year factor
(3) Present value ordinary annuity—2 year factor
(4) Present value ordinary annuity—12 year factor less 2 year factor
(5) Present value reversion—12 year factor
(6) Present value reversion—4 month factor.

 The Appellate Division, in a per curiam decision, found that the taxpayer did substantiate its position that actual rents constituted economic rent by producing comparables from the market place.

 This figure was achieved by multiplying 6 units at $400/month by 12 months which equals $28,800, and adding that figure to 28 units at $350/month for 12 months ($117,800). The municipality's expert noted that he utilized 1981 rental figures for 1980 (October 1, 1980) because they were most like those of 55 Teaneck Road, considered the best comparable, as of October 1, 1981.